## Grant's Administrators *versus* Kline.

A., a creditor of his brother-in-law B. in the sum of $743, a part of which was for premiums on other insurance which he had allowed to lapse, in good faith, insured him for $3,000, paying all the premiums. Upon the death of B., the company paid A. the insurance. In an action by the administrator of B. against A. to recover the amount of the insurance paid A., less the debt due him and the premiums paid to secure and carry the insurance. *Held*, (*a*) that under the circumstances of the case, the amount of the insurance was not so disproportioned to the debt due, as to make the policy a wagering policy. (*b*) That in the absence of evidence, the disproportion between the amount of the insurance and the debt due, would not raise a presumption that the insurance was merely collateral to the debt. (*c*) That the statement of B : " I gave A. a policy of life insurance on my life, and after my death, why of course he can realize what I got from him," though uncontradicted, was not conclusive that the policy was intended to be collateral to the debt. (*d*) That it was neither immoral nor wagering for A. to secure the sums he had fruitlessly paid in premiums on other policies on B.'s life, and if B. had no objection thereto, and assisted him therein, no one but the insurance company could object to it.

March 3d, 1887. Before MERCUR, C. J., PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ. GORDON, J., absent.

ERROR to the Court of Common Pleas of *Berks county :* Of July Term 1886, No. 97.

Assumpsit by Priscilla Grant and Adam H. Schmehl, administrators of the estate of Bertolette Grant, deceased, against Jacob Kline, deceased, to recover the amount of insurance received by him on a policy of life insurance on the life of the

[Grant's Admrs. v. Kline.]

decedent, less the amount of premiums paid to secure and carry said policy and the amount of the debt due him by the decedent. Pleas, non assumpsit, with leave.

The following are the facts as they appeared on the trial:

In 1882, Bertolette Grant, a widower, called upon the agent, at Reading, of the U. B. Mutual Aid Society of Penna., stating to the agent that he was greatly indebted to Kline (the defendant in error); that he (Kline) had favored him financially, and took out a policy of insurance upon his life for the benefit of Kline, his brother-in-law, and creditor, for $3,000. Prior to this insurance, Grant had informed Joseph Deysher that he was about to be insured in favor of Jacob Kline; that Jacob Kline was a brother-in-law of his, and that he owed him a debt, a considerable amount of a debt; he wanted to pay him, and this was the only remedy which he had, otherwise he could never pay him. For this reason he took out the policy in favor of Kline, to pay his debts. Grant, at the time of the issuing of the policy, March 22d, 1882, was indebted to Kline in the sum of $743.56, made up as follows:

Judgment No. 149, Aug. T. 1874, entered by
　default, &c., Aug. 22, 1874, . . . $164.45
Interest on same, . . . . . 53.48
　　　　　　　　　　　　　　　　　　　——————$217.93
Promissory note, dated Jan. 24, 1881, . . $ 50.00
Interest on same, . . . . . 3.48
　　　　　　　　　　　　　　　　　　　———— 53.48
Amounts paid by Kline on former policies aban-
　doned, and in lieu of which the present policy
　was taken out:
Premiums and payments by Kline on policy
　issued in 1875, in U. B. Aid Society, . 231.40
Premiums and payments by Kline on policy
　issued Feb. 4, 1880, by Prudential Aid So-
　ciety, . . . . . . . 240.75
　　　　　　　　　　　　　　　　　　　——————
Total, . . . . . . . $743.56

These policies of insurance, upon which the premiums paid by Kline, amounting to $472.15, were taken out by Grant upon his life, and were by him transferred to Kline as his creditor. Both these policies were subsequently abandoned, and a third policy taken out in place of the same by Grant on his life, direct to Kline, as his creditor. On the trial, the defendant contended that these several sums together, amounting to $743.56, represented the actual indebtedness from Grant to Kline, and created an insurable interest, in favor of Kline, in

the life of Grant; that the policy was valid at its inception; that the disproportion of the indebtedness and the amount of the policy of insurance was not so great as to make it a wagering policy, and that the proceeds thereof belonged to the defendant.

On the trial, the defendant's counsel proposed to ask the witness whether, as such officer and agent of the U. B. A. Insurance Company, he knew that a policy of insurance was taken out by Bertolette Grant, and transferred to Jacob Kline as his creditor, whereon divers sums of money, as premiums, were paid by Jacob Kline for a number of years. Also a like policy taken out by the said Bertolette Grant, and transferred to Jacob Kline, as his creditor in the Prudential Mutual Aid Society of America, the premiums upon which insurance were likewise paid by the defendant. That, subsequently, both of these policies were abandoned, and the policy in suit was taken out in their place. This for the purpose of showing the expenditure of large sums of money by the defendant in order to secure the payment of his indebtedness, and for the further purpose of showing that he had an insurable interest, and this to be followed by receipts showing such payments of premiums.

Plaintiffs objected. First, because payments made by the defendant upon any other policies of insurance at any other time, in which he was the beneficiary, and which were therefore made for his benefit, would not be allowed as credits upon the policy for the proceeds of which this suit was brought. Second, that any such payments made by the defendant were voluntary payments, and did not constitute an indebtedness of Bertolette Grant to the defendant, and are no evidence of indebtedness. Third, that it is inadmissible, immaterial and irrelevant.

Evidence admitted. Plaintiffs except. Bill sealed. (Seventh assignment of error.)

The plaintiff requested the court to charge, *inter alia*, as follows:

1. The disproportion of the debts of $214 alleged to have been owing by Grant to Kline at the time of the insurance, and the amount of the insurance, viz., $3,000, is so great as to make it merely a wagering policy, and, such policy being void in law, the defendant is not entitled to hold the proceeds of the policy, and the verdict must be for the plaintiff for the amount received by the defendant less the assessments paid and the debt proved.

2. The defendant is only entitled to receive out of the proceeds of the policy the amount of his debt with interest, and the assessments paid with interest, and after allowing

these credits the verdict must be for the plaintiff for the balance in the hands of the defendant.

4. The disproportion of the debts alleged to have been owing by Grant to Kline at the time of the insurance to the amount of the insurance, viz., $3,000, is so great as to make it merely a wagering policy, and, such policy being void in law, the defendant is not entitled to hold the proceeds of the policy, and the verdict must be for the plaintiffs for the amount received by the defendant, less the assessments paid and the debt proved.

Answer of the court to the three points. If the jury find that Grant owed Kline the judgment recovered in 1874 with its interest and costs, amounting to $249.32, and the note of $50 with its interest, amounting to $53.48, together amounting to $302.80, and, if the jury find that Kline paid on two former policies premiums in sums taken together amounting to $474.96, Kline had an insurable interest at the inception of the insurance, and the policy was not a wagering policy, and the verdict in such case must be in favor of the defendant. If the jury, however, do not so find, the points are affirmed, and the plaintiffs are entitled to a verdict for the amount received by Kline, with interest, less the amount of his debt and the assessments paid on the last policy. (Second, third and fourth assignments of error.)

6. John Zerbe, the witness called by the defendant to prove the declarations of Grant, October 7th, 1882, having testified that Grant said he owed money to Kline, and gave Kline a policy of life insurance, " I gave Kline a policy of life insurance on my life, and, after my death, why of course he can realize what I got from him," and this evidence being uncontradicted establishes the fact that the understanding was that Kline should have his debt, and the balance to the estate of Grant.

Answer of the court. If the jury from the evidence find that there was an agreement between Grant and Kline at the time the policy of insurance was effected, that Kline was only to receive the amount of his debt at Grant's death, this point is affirmed. Now the evidence upon that point is found in the testimony of Zerbe. Q. Come right down to what he said about money. A. He said that he (meaning Kline) never refused any favor whatever, that he gave him considerable money, but he says, " I gave Kline a policy of insurance " on his life, " and after my death, why of course he can realize what I got from him." Now this is the only evidence that there is upon that point. It is not necessary for the court to say anything further to you about it. The evidence discloses the fact that Kline was a brother-in-law of Grant, and that Grant recognized Kline as one of the best friends he had, and,

if the jury find in regard to these various sums to which I have referred, that they were paid by Mr. Kline at that time prior to the taking out of this policy on the 22d of March, 1882, then Kline had an insurable interest in the life of Bertolette Grant, and the money realized on that policy belonged to Mr. Kline, and your verdict will be for the defendant.    On the other hand, if you find that those payments were not made by Kline, and there was no such indebtedness, then your verdict would be in favor of the plaintiffs, deducting the premiums which had been paid, amounting to $293.40, and for the balance they will be entitled to a verdict after deducting from the amount of the policy received by Kline the premiums which he paid.    (Sixth assignment of error.)

Verdict for the defendant and judgment thereon, whereupon the plaintiffs took this writ, and filed, *inter alia*, the above assignments of error.

*Richmond L. Jones* (*Adam H. Schmehl* with him), for plaintiffs in error.—It would be easy to evade the rule, so long established in Pennsylvania, against wager policies, if the gambler could, by a small loan to the insured, establish the relation of debtor and creditor, and so assure his title to the proceeds of a policy whatever disproportion it might bear to the debt.    A relationship of consanguinity or affinity cannot be put on to-day and off to-morrow, and therefore affords a safe rule, but the relationship of debtor and creditor may be false or genuine, real or assumed, and the courts have therefore undertaken to critically scrutinize the transactions of investors in insurance, and to apply a test to the *bona fides* of creditors, which is that of proportion between the debt and the policy.    In Cammack *v.* Lewis, 15 Wallace, 643, the court said: " The disproportion between the real interest of the creditor and the amount to be received by him deprives it of all pretence to be a *bona fide* effort to secure the debt," and declared it a mere wagering policy.    It would be an affront to the court to pretend that Kline had a reasonable ground to expect any benefit or advantage from the continuance of the life of Grant, and, as Mr. Justice FIELD said (in Warnock *v.* Davis, 14 Otto, 775): " Otherwise, the contract is a mere wager by which the party taking the policy is directly interested in the early death of the insured."

The indebtedness was about 10 per cent. of the amount of the policy, and it is simply absurd to contend that this was a *bona fide* effort to secure that debt.    The reasoning and conclusions in both Warnock *v.* Davis and Cammack *v.* Lewis, *supra*, were adopted by the Supreme Court of Pennsylvania

in Gilbert *v.* Moose, 8 Out., 74, and the uniform line of cases following, which declare the law upon this subject.

*J. H. Jacobs* and *Henry C. G. Reber (H. P. Keiser* with them), for defendant in error.—Mr. Justice ALLEN, in passing upon a question similar to the one raised in this case in Mut. Life Ins. Co. of N. Y. *v.* Allen, 19 Rep., 52, says : " The other objection urged is that such transactions may lead to gaming contracts. Most contracts have an element of gambling in them ; there is uncertainty in the value of any contract to deliver property at a future day, and great uncertainty in the present value of an annuity for a particular life, or of a sum payable in the event of a particular death. . . . . . The value and permanency of the interest is material only as bearing on the question whether the policy is taken out in good faith, and not as a gambling transaction." Mr. Justice CLARK says in Corson's Appeal, 3 Amerman, 438 (citing Dalby *v.* India and London Life Ins. Co., 15 C. B., 365) : " The law seems to be well settled that it is wholly unnecessary to prove an insurable interest in the life of the assured at the maturity of the policy, if it were valid at its inception, and in the absence of express stipulation to the contrary the sum expressed on the face of the policy is the measure of recovery." The policy in this case was not a wagering policy : Scott *v.* Dickson, 12 Out., 6.

Mr. Justice PAXSON delivered the opinion of the court, March 21st, 1887.

The second assignment presents the controlling point in this case. It alleges that the court below erred in not affirming the plaintiffs' first point. The point was as follows : The disproportion of the debts of $214 alleged to have been owing by Grant to Kline at the time of the insurance, and the amount of the insurance, viz. : $3,000, is so great as to make it merely a wagering policy, and such policy being void in law, the defendant is not entitled to hold the proceeds of the policy, and the verdict must be for the plaintiffs for the amount received by the defendant, less the assessments paid and the debt proved.

This point assumes the amount of the debts due Kline from Grant, but as the plaintiffs' fourth point, which is free from this objection and was also declined, raises the same question, we will consider it as if no such defect existed.

It is very clear, if the testimony in the case is to be believed, that the policy in question was taken out by Mr. Grant and assigned to Kline in entire good faith. There is nothing to cast suspicion upon the integrity of the transaction. I will refer to the disproportion of the debt to the amount insured

hereafter. I am now alluding to the good faith of the parties as distinguished from the gambling policies in Gilbert *v.* Moose, 104 Penna., 74, and that line of cases. Kline and Grant were brothers-in-law, and it appears that Kline had befriended Grant in various ways, and had from time to time loaned him money. The latter said when he applied for the policy that he was greatly indebted to Mr. Kline; that he had favored him considerably. Also that Grant said: Jacob Kline was a brother-in-law of his, and he owed him a debt, a considerable amount of a debt, and he said he wanted to pay him and this was the only way, the only remedy which he had, otherwise he could never pay him. For this reason he took out the policy in favor of Mr. Kline to pay his debt. In the testimony of Joseph Deysher, another witness, John Zerbe, also stated that Grant told him that Kline was the best friend he ever had; had never refused him any favors whatever; had given him considerable money; that he (Grant) had given Kline a policy of insurance on his life, etc. After the death of Mr. Grant the company paid over the money to Mr. Kline and this suit was brought by the administrator of Grant to recover it back, less the amount of the actual debt, and the premiums paid on this policy by Kline. There was no evidence to submit to the jury that the policy was given as collateral security; the premiums were all paid by Kline; hence if the plaintiffs can recover at all it can only be because the policy in question is a gambling or wagering policy.

It was not disputed at the trial below that there was a *bona fide* indebtedness of Grant to Kline at the time the policy was taken out of something over $300. It was also in evidence that one or more policies had been taken out on Grant's life for Kline's benefit prior to the policy in question. These policies had been abandoned because of the insolvency of the companies or other sufficient reason. Kline had paid in premiums thereon several hundred dollars. While the money thus fruitlessly paid in premiums may not have amounted to an insurable interest in the life of Grant, for the reason that such payments did not make him a creditor for their amount, we think they show good faith in the transaction. This case is to be determined upon the facts as they existed at the time the last policy was taken out, and if both Grant and Kline saw proper to treat the premiums paid as an insurable interest, Grant's administrators have no standing to say they were not. The company could have defended upon this ground but it did not. It paid the money over to Kline without question.

This brings us to the main question, Was the amount of insurance so disproportioned to Kline's interest in the life of

[Grant's Admrs. v. Kline.]

Grant as to make this a wagering policy? We approach this question with caution, the more so that this court has not yet laid down a rule upon this subject. That we shall be compelled some day to do so is possible. We have said that the sum insured must not be disproportioned to the interest the holder of the policy has in the life insured. To take out a policy of $5,000 to secure a debt of five dollars would be such a palpable wager that no court would hesitate to declare it so as a matter of law. Care must be taken also that a debt shall not be collusively contracted for the mere purpose of creating an insurable interest. Mr. Dickens, in his inimitable "Pickwick Papers," has shown how a debt may be created for the purpose of lodging the debtor in prison by collusion with the creditor. Speaking for myself, it may be that a policy taken out by a creditor on the life of his debtor ought to be limited to the amount of the debt with interest, and the amount of premiums with interest thereon during the expectancy of life, as shown by the Carlisle tables. This view, however, has never yet been adopted by this court in any adjudicated case, nor do we feel compelled to define the disproportion now in view of the particular facts of the case in hand. We do not regard it as either immoral or wagering for Kline to attempt to secure the sums he had already fruitlessly paid in premiums on Grant's life, and if Grant had no objection thereto, and assisted him therein, I do not see that any one could object to this but the company. Again, we have the declarations of Grant that he owed Kline a considerable sum of money, the precise amount not stated—that Kline had aided him in various ways; had never refused him a favor, etc. In view of their connection by marriage, and of their admitted relations, it is at least probable that Kline had aided him at many times and in various ways pecuniarily that are not represented by any evidences of debt. And if the sum insured was regarded by Grant as a reasonable amount to indemnify Kline, with what grace can Grant's administrators come in and allege that it was not? They have no possible equity; Grant never paid one dollar of the premium, and if they are allowed now to recover, it is not by virtue of any equity, but by force of an inexorable rule of public policy which treats it as a wagering policy, and declares the policy holder a trustee for the person insured as to the entire proceeds save only the money actually loaned, with the premiums paid.

Assuming then that Kline might with Grant's consent, and as against his administrators, lawfully seek to indemnify himself for the premiums paid and lost, we have the sum of $743.56 as the amount which Kline was out of pocket. We do not know what Grant's expectation of life was when the policy

5 Amerman—40

was taken out, and there is nothing before us upon which we could base any reliable opinion. But it appears he was sixty-five years of age, and was an unusually good risk. While we do not know what the amount of the annual premium was, we do know that it must have been a considerable sum on $3,000 for a man of sixty-five years, and with the annual interest would roll up rapidly. That Grant died within a year is not to the purpose ; he might have lived long enough for the debt and premiums at compound interest to have exceeded the amount of the policy. Surely, in such case, we cannot say as a matter of law that the disproportion was so great as to make it a wagering policy.

We see no error in refusing to affirm the point referred to in the sixth assignment. We do not think the declarations of Grant embodied in the point are conclusive that the policy was intended as collateral security merely, and that the amount of the policy, less debt and premiums, was to be paid over to Grant. On the contrary, they would not have justified such finding by the jury. Everything in the case indicated that this was intended as a creditor's policy in which Grant had no interest. As before observed, the latter paid no premiums.

The evidence referred to in the seventh assignment was properly admitted. If for no other reason, to show good faith. But, as has been already said, it was competent to show these payments of premiums for other purposes.

Judgment affirmed.