Montgomery's Estate.

Argued January 20, 1930. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, SADLER and SCHAFFER, JJ.

*Franklin L. Wright,* with him *J. Nelson Dick,* for appellants.—The policy of insurance constitutes the entire contract between the parties.

No agreement between the parties can be implied from the circumstances of the transaction or any equities between the parties: Gifford v. Gifford, 93 N. J. Eq. 301.

An implied agreement to pay the premiums by the deceased insured finds no basis on the theory of his duty by way of contribution.

Evidence of the method of payments of premiums between the insured, prior to the refusal of one insured to make further payments, is inadmissible to establish an implied contract betwen them to continue payments of premiums until the death of one of the insured.

*Henry M. Tracy,* for appellee.—We do not contend there was any obligation as between the insured and the insurance company to pay the premium or continue the contract, but we do contend that, as between the beneficiaries themselves, a contract existed which neither

had the right to alter nor cancel without the consent of the other party to the contract, where no such right is reserved in the policy, and where, by such cancellation, the interests of one of the parties in the contract would be jeopardized or depreciated in value.

The obligation of both parties under this insurance contract was not divisible nor subject to revocation except by the joint consent of both parties to it, and as the premium was paid by one of the parties under compulsion in order to protect his rights under the contract, the remaining party is liable for his share of the same: Hogg v. Lonstreth, 97 Pa. 255; Mosier's App., 56 Pa. 80; Millard v. R. R., 240 Pa. 234, 244; Watson's App., 90 Pa. 426; Hoff v. Kauffman, 282 Pa. 471, 472; Baily's Est., 156 Pa. 634.

The deceased was relieved of a common burden imposed by the policy contract, out of which he had a possibility of benefits and consequently should equitably bear his share of the burden: Com. v. Cox, 36 Pa. 442.

OPINION BY MR. JUSTICE FRAZER, March 17, 1930:

These two appeals involve the same questions, were argued together and will be disposed of in one opinion.

In 1912, two brothers, Marshall Montgomery and Henry S. Montgomery, procured from a life insurance company a joint life policy for an insurance of $20,000, payable to the survivor of either. The yearly premium was $1,540.80, less earned dividends. From 1912 to 1919 the premiums were regularly met by each of the co-insured paying one-half of the amount. Upon the premium for 1919 falling due, Henry refused to pay his one-half, and thereafter paid no portion of the assessments. From that year until his death in 1927 the entire premiums were paid by Marshall, to whom, as the survivor, the company paid the whole of the $20,000 insurance money. At the audit of the estate of Henry the survivor claimed repayment of one-half of the entire amount paid by him as premiums from 1919 to 1926,

inclusive, with interest on these payments, on the ground that the policy, being a joint contract with the insurance company, the coinsured were jointly bound to keep it alive, that they had a joint interest in the proceeds of the insurance so long as both lived, that by an implied contract between the insured themselves they were mutually obligated to each pay one-half of the premium cost, that neither could withdraw from that special agreement without the consent of the other except to the injury of his coinsured, and that Marshall, upon refusal of his brother to pay his portion of subsequent accruing premiums, paid the entire annual amounts, himself under compulsion to keep the policy alive and thereby protect and preserve his interest in the insurance. In the adjudication the claim was allowed, exceptions to the audit filed by appellants were, after argument, dismissed by the court below and the adjudication confirmed. These appeals here followed.

The claim for repayment is contested by appellants on the ground that Marshall Montgomery was under no legal obligation to pay either his own or his brother's share of the premiums, his action in so doing being purely a voluntary act on his part, that no implied special contract existed between the insured, and that consequently the survivor was not entitled to contribution.

Neither the auditing judge nor the court in banc below sustained this contention, but on the contrary found the evidence supported the position taken by appellee.

Our reports are notably bare of cases exactly of this character; we do not see, however, after careful review of the record, that any complex or new questions arise under the facts and circumstances disclosed that have not hitherto been in litigation over life insurance, considered and determined in this and other jurisdictions on principles of equity and fair dealing, strictly applicable to the case at hand.

The policy in question is a joint insurance contract with the insurer whereby the two insured, by its terms,

are "hereinafter designated jointly as the insured," the insurance to be paid "to the survivor" of either, "with the right on the part of the insured jointly to change the beneficiary," the plan of participation in the annual dividends to be chosen "at the option of the insured jointly," the policy to be "surrendered by the insured jointly (or by the assignee if any)," and the proceeds of the insurance to be paid "to the survivor." Here certainly was established an indivisibility of joint interest and rights as between the insured. It was not, however, an agreement between themselves, but a contract between them and the insurer, and so long as the main obligation imposed by the contract upon the coinsured,—the regular and full payments of the premiums,—was fulfilled, the insurance company could have no concern. It required no more than payment of the premiums within the stipulated time; as to which of the insured paid the premiums, or in what proportion each paid, was not its affair. That was a matter for the brothers to settle between themselves. If they at any time failed to meet the premiums, and the day of grace passed and no waiver by the insurer was forthcoming, the contract of insurance ended. Under the terms of the usual life policy there is no promise to pay premiums, and it rests with the insured to say for what length of time he will continue such payments: 2 Cooley's Briefs on the Law of Insurance 1625. This is a litigation however, not between the insurer and the insured, but between the two insured, and, according to the reasoning of appellants no contractual relations exist between them which can be sustained. We shall leave aside any suggestion of a moral obligation, either as weighing upon the deceased brother while he lived or upon his estate after his death, for unquestionably, so far as the insurance contract obligated him, it was optional with him, or with his brother as well, to keep up the insurance or discontinue it, by paying or not paying premiums. But it is claimed by

appellee, and so found by the court below, that the evidence shows there was an implied special agreement between the insured themselves by which they mutually settled upon a definite plan whereby each was to share his equal proportion of the premium cost. Claimant asserts that both had, under this special contract, a joint and identical obligation to pay as so agreed upon, and that neither, without the consent of the other, could nullify the agreement without doing positive injury to the other. We need not specify authorities or decisions to hold so common a principle that contractual relations under such special agreement, expressed or rightly implied, are binding upon the parties thereto, and that the bearing of the mutual burden and performance of the mutual duty imposed are not to be arbitrarily refused by either party without incurring liability. The principle is clearly expressed in 1 Williston on Contracts, 666 as follows: "The obligors before entering into the obligation [in this case, the insurance contract] may have made a special contract with one another as to the shares in which the liability should ultimately be borne by them. If they have made no such contract, it will be inferred that their shares are in proportion to their interest in the matter. ...... As between obligors who are equally interested......the duty to bear the burden is equal and contribution will be enforced in favor of one who has paid more than his proportion against the others who have paid less."

Of course, in this case, the mere fact that the insured, for a time, each paid one-half of the premium charges, would not of itself allow the inference that they had a special agreement between them. We are however of opinion that evidence here, wholly uncontradicted, fully supports such inference. A contract implied in fact, or an implied contract in the proper sense, arises when the intention of the parties is not expressed, but an agreement in fact creating an obligation, is implied or pre-

sumed from their acts; or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual interest to contract: 13 C. J. 241. In the case in hand, the two insured persons, experienced and successful business men, entered jointly into an insurance venture wherein their rights and interests were identical, the fruits of which they each might expect to be the ultimate recipient. The annual premiums were not trifling in amount, being over $1,500; the insurance money to be paid to the survivor was considerable. It was in fact a matter of large mutual importance, and the nature of these facts alone certainly permits the inference that they must have had, following the ordinary course of financial transactions generally, a compact with each other as to the mutual making and carrying out of all arrangements necessarily attendant upon their contract with the insurance company. We think the evidence sustains the claim of appellee that there was such compact between them.

There was nothing haphazard in their acts with regard to the insurance, and the methods they employed in that respect were such as practical business men would agree upon as between themselves. They agreed to pay premiums by check, and apparently it was Henry who turned the money into the insurance company. Moreover, written evidence, produced at the trial under objection by appellants' counsel, but properly admitted, shows that, recognizing their joint interest in the insurance, they agreed between themselves that each should maintain an equal share of the cost of keeping the policy in force. Original checks offered in evidence, and their authenticity not denied, showed that for a period of six years they regularly paid the premiums, each paying one-half of the amount. During that period there was no variation from this plan of payment, and no diminution or increase of the sum each paid, except as the yearly dividends immaterially less-

ened them. The equality of the financial burden remained the same, and that this mutuality of action was the result of a special agreement between the insured is impressively shown by the writing referred to above. It consisted of a communication from Henry to his brother, headed "M. M.," admitted to mean Marshall Montgomery, and was as follows:

"M.M. Enclose bill for premium on 1769841 due June 24th, 1918. If you will send me your check by June 20th will see that it is paid. Amount $1540.80. Cash Option $303.00. Balance $1237.80, 50-50 $618.90. Insurance. [Signed] H. S. M."

The writing is illuminating and discloses in detail some, at least, of their agreement. It shows, first, by the words, "cash option," they agreed to accept a particular option as to the application of the annual dividends, as set forth in the insurance policy, produced in evidence; and, second, that they contracted with each other to carry the insurance on a "50-50" basis, the common mode of saying that a business arrangement between two parties is carried on an equal basis as to expenses or proceeds, or as to both. The writing has further particular significance. It tends strongly to prove that the "50-50" basis was still in effect five years after commencement of the insurance, and during that time each fulfilled his obligations as agreed upon between them. They recognized the complete entirety of the premium; they knew they had, so long as both lived, an identical interest in the insurance, and they contracted to make up the yearly lump sum by each paying an equal share of it. As the learned auditing judge said in his adjudication: "The premium was a single one. The benefits from the policy were equal and the just division as to the responsibility for payment of the premiums would be, payment of one-half by each. This is exactly the implied agreement that they entered into."

Inasmuch as we find, with the court below, that a special agreement, as we have detailed, existed between the

460

insured, what was the status of Marshall Montgomery with respect to his interest in the insurance when, after refusal of his brother to pay any part of the premiums, he took the entire burden upon himself and paid them until the death of the other insured? Was his insurable interest in the proceeds of the policy destroyed by failure of his brother to meet his share of the premiums? Admittedly, under this insurance policy the company was without authority to compel either or both to pay the premiums and there existed no legal impediment preventing either or both from paying them. But we are not now concerned, except indirectly, with the contract between the insurer and the insured. We are dealing with the implied contractual relations between the latter themselves, and it is essential to say that under these relations one could not refuse to pay his share of the premiums without bringing injury to the other. Marshall might, of course, have elected to drop the insurance by following the action of his brother, when in 1919 the latter refused to make further payments. But for sound reasons he did not elect to do so. He had already paid more than four thousand dollars in premiums; he did not wish to see the policy lapse, he had a legal speculative interest in the life of his brother, as the latter had in his life, and he decided to keep the policy in force. Did he pay the premiums as a mere volunteer? He certainly had an insurable interest. From their blood relationship each had an insurable interest in the life of the other to support a joint policy on their lives, payable to the survivor: Bonistalli v. Bonistalli, 269 Pa. 8, 12, and the cases there cited. Indeed, as was said in Appeal of Corson, Executor, 113 Pa. 438, 447, "The law seems to be well settled that it is wholly unnecessary to prove an insurable interest in the life assured, at the maturity of the policy, if it was valid at its inception." Nor was it a wagering policy: Ætna Life Ins. Co. v. France, 94 U. S. 561, 565. The refusal of Henry to pay his part of the premium was not done with the consent

of the coinsured nor was it acquiesced in by him. In 3 Joyce's Law of Insurance, section 1651, it is declared: "One whose life is insured for the benefit of another cannot rescind or surrender the policy without the beneficiary's consent, where the right of the surrender is vested."

If this case were an action between the insurer and the insured to recover the insurance money, with the same circumstances as they stand here, the liability of the insurer would be established, as under the joint policy, notwithstanding the alleged cessation of the insurable interest of the one, by reason of his refusal to pay further premiums, the payment of all premiums by the other would keep the contract in force and the insurance proceeds would go to the survivor of either. In Connecticut Mutual Life Ins. Co. v. Schaefer, 94 U. S. 457, a husband and wife procured a joint policy on each other's life, payable to the survivor, upon the death of either. Later, they were divorced and both married again. After the divorce the first wife paid the premiums and, upon the husband's death, the insurer refusing to pay her the insurance proceeds, she brought suit to recover. In affirming the judgment of the court below in favor of claimant, Justice BRADLEY said: "A joint act was to be done...... Either had a right to do it. The act was to pay or settle the annual premium. The plaintiff, as one of the joint parties, performed what was necessary to be done. George F. Schaefer could not complain; for it was done in his interest, keeping the policy alive for his benefit as well as for Francisco's. The company could not complain," as it had accepted the money for the premiums. The court in the above case was not called upon to decide whether or not there was a special agreement between the insured; but their inseparable interest was, as here, not a matter for debate.

In the present controversy, not only was the joint interest admitted by both of the insured; they also obli-

gated themselves by special agreement, clearly implied, and indeed in a large measure obviously established by the evidence, to fulfill, on a "50-50" basis, the requirements of the joint insurance contract. It was a contract where each obligor bound himself for a ratable or other portion of the total performance: Williston on Contracts, 605; 25 Cyc. 899. For some years they each paid their ratable proportion as agreed upon, and by such payments made a contractual duty as between themselves; and both, being experienced in business and financial affairs they would unquestionably know the consequence of the failure of either to perform his part of their covenant. It was, then, not the insurance contract that was binding them; it was their own mutual covenant, a contractual relation which they might create subsidiary to the contract with the insurer: 25 Cyc. 899; Willoughby v. Willoughby, 70 S. C. 516, brothers, beneficiaries of an insured, agreed between themselves to pay, at the death of the insured, portions of the proceeds of the policy to their two sisters. One of them paid his stipulated portion, the other did not, and the sisters brought suit against the delinquent to compel payment of his share, and recovered. The court held there was a mutuality of contract which required observance of the special agreement by the brothers with each other, as well as with the sisters.

What was the moving cause of the refusal of Henry Montgomery to pay further premiums is not shown, nor is it directly material here. He probably intended to divest himself of any right to the proceeds of the insurance. We say, probably, since an intention of actual renunciation is hardly borne out by his subsequent acts. He not only made no offer, as far as the record shows, of a cancellation of the policy or of its surrender; but instead, having the policy in his possession when in 1919 he failed to pay his share of the premiums, he kept and retained it under his control until his death, when it was found among his papers. It was at least an equiv-

ocal act, as he was continuing to enjoy the benefit of the insurance without bearing any of the cost; and he must have known and understood the nature of the joint contract with the insurer, to the effect, that if his brother kept the policy alive by meeting all premiums as they fell due and then predeceased him, he, as survivor, would benefit to the full amount of the proceeds. Appellants note that there is no evidence of demand on him by claimant to surrender the policy. Yet he must have known, as well as his brother, that, the latter by assumption of the entire burden of keeping the policy alive, was preserving the joint interest of both.

In assuming that burden was he, under the circumstances in the case, paying the premiums as a mere volunteer, not paying under compulsion to protect his own right in the insurance, as appellants contend? Under the insurance contract neither was bound to pay premiums. "The insured," as the principle is stated in 2 Cooley's Briefs on the Law of Insurance, "was not bound to do anything whatsoever, and need not pay any premiums when due, as he merely agrees that, if he fails to pay, his rights under the policy shall be forfeited or otherwise affected"; hence, in the present case, if both elected to cease payments the insurance was at an end. But here were created, aside from the terms of the policy, joint contractual relations between the insured alone, which merged, at the inception of the contract with the insurer, the interest of both in the insurance into a single joint interest to be preserved only by the performance of a single act,—the payment annually of the premiums, and thus, in the words of the learned auditing judge, "each impliedly agreed to assume his share of the burden." As the evidence shows, they affirmed that implied agreement, as between themselves, by mutually adopting and employing practical methods for its joint performance. Such agreement could not be disavowed at will by one without the consent of the other; and when, after six years of equal payments of

premiums, Henry disavowed it, the other insured elected to continue its terms, as he had a right to do, under their special agreement. He had worthy and substantial reasons for so deciding. He had already paid over four thousand as his share of the premiums, he had a legal and incontestable speculative insurable interest in the life of his brother, and generous fraternal considerations might also influence him to continue the insurance, since there was a probable ultimate benefit to the other. But at any rate, his own interest was at stake; he had a right to protect it. There remained but one way by which he could do so,—pay the entire premiums himself. The joint insurance contract allowed him no other way of avoiding lapse of the policy, and, being under compulsion, to preserve his rights and to keep the policy alive, he met all premiums as they came due. Payments thus made were not made under requirements of the insurance contract, wherein, indeed, there were no such requirements, but they were made in conformity with the terms on the "50-50" basis, of the implied agreement between the insured; and it has long been an established principle that, as set forth in 2 Joyce's Law on Insurance 1862, where there are several beneficiaries of a policy and one pays the entire premiums with the object and purpose of keeping the policy alive, he may compel contribution upon the death of the insured; and see Grant's Administrators v. Kline, 115 Pa. 618, where it was said that it was an equitable rule that such amounts of the premiums be paid. See also Seigrist, Admr., v. Schmoltz, 113 Pa. 326; Ulrich, Executor, v. Reinoehl, 143 Pa. 238; Haberfeld v. Mayer, 256 Pa. 151. We have examined the authorities cited by appellants and find none of them applicable; the English cases referred to are especially so, being decided on issues quite foreign to those here involved.

The assignments of error directed against the final decree of the court below, the admission of certain evi-

dence and the findings of the auditing judge are not sustained.

The decree of the court below is affirmed at cost of appellants.