MUTUAL LIFE INS. CO. OF NEW YORK v. LANE et al.

(Circuit Court, E. D. Georgia, S. D. February 4, 1907.)

1. COURTS—FEDERAL COURTS—RULES OF DECISION.

Ga. Civ. Code 1895, §§ 2114, 2116, provide that insurance on life is a contract by which the insurer for a stipulated sum engages to pay a certain amount of money if another dies within the time limited by the policy, and that the life may be that of the insured, or of another in whose continuance the insured has an interest, etc., and that the insured may direct the money to be paid to his personal representatives, his widow, his children, or his assignee, and upon such direction, assented to by the insurer, no other person can defeat the same, etc. *Held,* that such provisions were merely declaratory of the general law, and hence the federal courts sitting in Georgia were not bound by a construction of such sections by the highest court of the state not in accord with the views of such federal courts.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 950–957.

State laws as rules of decision in federal courts, see note to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

2. SAME.

A ruling which interprets the words "to be paid to an assignee" to import that such assignee need not have an insurable interest is not construction, but is judicial amendment.

3. INSURANCE—LIFE INSURANCE—ASSIGNMENT—INSURABLE INTEREST.

An assignment of a life insurance policy to a third person not a relative or creditor, and having no insurable interest in the life of the insured, is invalid.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 166, 167.]

4. SAME—GOOD FAITH.

Evidence of inspection as to good faith and integrity of transfer discussed.

5. INTERPLEADER—COUNSEL FEES.

Where the proceeds of a life insurance policy, amounting to $46,133.89, were claimed by the insured's executors and also by an alleged assignee, and the insurance company successfully filed a bill of interpleader, in which it was determined that the proceeds belonged to the executors, subject to a deduction for amounts paid by the assignee, the attorney for the insurance company may be allowed a fee of $1,000 for his services.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 29, Interpleader, § 76.]

Bill of Interpleader.

A. R. Lawton, for complainant.
Robert M. Hitch and Remer L. Denmark, for executors.
Garrard & Meldrim, for Max Alexander.

SPEER, District Judge. The Mutual Life Insurance Company of New York filed a bill of interpleader, with the averments following. On the 5th of August, 1899, it issued a policy of insurance on the life of the late John R. Young, then of Savannah, Ga. The policy was made payable to his executors, administrators, or assigns. The contract was what is known as a "20-payment, deferred dividend life policy," with the cash surrender, loan, and extended insurance provisions usual in such

policies. Its face value was $50,000, and the annual premium $2,242. On the 9th day of September, 1902, Young borrowed from the company the sum of $4,000, and pledged the policy as security therefor. Young died on November 19, 1905. Previously to his death, namely, on the 30th of April, 1903, there was filed with the complainant what purported to be an assignment of the policy from Young to one Max Alexander. Shortly after Young's death Max Alexander, claiming to be assignee, filed proofs of death, claiming the entire amount payable on the policy. This was $46,133.89.

The assignment is as follows:

"For one dollar, to me in hand paid, and for other valuable considerations (the receipt of which is hereby acknowledged) I hereby assign, transfer, and set over to Max Alexander, whose P. O. address is Savannah, Ga., all my right, title and interest in this policy No. 983258, issued by the Mutual Life Insurance Company of New York, and for the considerations above expressed, I do also for myself, my executors and administrators, guaranty the validity and sufficiency of the foregoing assignment to the above named assignee, his executors, administrators, and assigns, and their title to the said policy will forever warrant and defend.

"Dated in Savannah, Ga., this 30th day of April, 1903.
   "[Signed]                                  John R. Young.
"In the presence of
   "[Signed]  M. Hyams, Jr."

Young died testate. By his will Mills B. Lane, J. W. Mott, and D. C. Ashley were appointed executors. The bill recites that these executors have notified the complainant that the assignment by their testator to Max Alexander is invalid. They claim the entire proceeds of the policy. Alexander also notified complainant that, if it paid the proceeds of the policy to the executors, he will hold it liable therefor. The assignment of the policy does not disclose the consideration for the transfer. Protesting that it is not in collusion with either party, averring its willingness to pay the proceeds to the persons entitled, and being advised that it cannot with safety pay the same to either, the complainant brings its bill against the executors of Young and against Alexander, and insists that they ought to interplead, in order that the court may determine, and the complainant know, to whom the proceeds of the policy should be paid. There are the usual prayers for process, and the further prayer that the complainant may be permitted to deposit the fund in court, and that upon such deposit the defendants may be enjoined from further molesting it about the matter in question. The deposit has been made, and order passed directing the controverting defendants to interplead, and the complainant in the usual way has been discharged and acquitted of all responsibility and liability to either of the parties defendant to the bill. The answers of the defendants are voluminous, but it does not appear that a recital of the various clauses thereof is essential to an understanding of the controversy. It is proper, however, to state that the executors admit that Alexander may equitably recover such sums as he may have paid out for or on account of the policy, with interest for the same, but they deny his right to the surplus, on the ground that since he had no insurable interest in the life of the testator the assignment is therefore null and void, as a speculation upon human life, and contrary to public policy. The assignee was neither related by

blood or marriage to the deceased, nor was he a partner, creditor, or otherwise financially interested with him in any pecuniary enterprise.

The questions presented are these: Did Alexander's lack of insurable interest in the life of Young ipso facto constitute such a wager upon that life, as to be void as against public policy, or, if not in legal contemplation inherently void, do the facts in evidence, attending the assignment, oblige the court to declare it a violation of the established rules regarding wagering contracts on human life? Max Alexander insists that no insurable interest in him was necessary. He contends that it was not required by the statutes of this state as construed by its highest tribunal. The assignee, in support of this contention, relies upon sections 2114 and 2116 of the Civil Code of Georgia of 1895. These provisions of the local statutory law are as follows:

"An insurance upon life is a contract, by which the insurer for a stipulated sum, engages to pay a certain amount of money if another dies within the time limited by the policy. The life may be that of the assured, or of another in whose continuance the assured has an interest."

"The assured may direct the money to be paid to his personal representatives, or to his widow, or to his children, or to his assignee, and upon such direction, given and assented to by the insurer, no other person can defeat the same. But the assignment is good without such assent."

It appears that these provisions of the state law were written by the first codifier, the late T. R. R. Cobb, whose profound and varied accomplishments have left an indelible impression upon the jurisprudence of the state. By a special statute, the state, in the codification of its laws adopted the first Code as an entirety. The same method has been followed with subsequent editions. The Code prepared by Mr. Cobb was adopted by act of the General Assembly, assented to December 19, 1860. It did not take effect until the 1st of January, 1862. The facts following may be of interest: On the 9th of December, 1858, provision was made by the General Assembly of the state for the election of three commissioners to prepare for the people of Georgia a Code, which should as near as possible express in a condensed form the laws of Georgia, whether derived "from the common law, the Constitutions and statutes of the state, the decisions of the Supreme Court, or the statutes of England of force in this state." David Irwin, Herschel V. Johnson, and Iverson L. Harris were elected commissioners under the provisions of this act. The last two named, declining the position, his excellency, Gov. Brown, supplied the vacancies by the appointment of Thomas R. R. Cobb and Richard H. Clark. On the 18th of March, 1861, a convention of the people then in session resolved that in the publication of the Code it should be made to conform to the government of the Confederate States, instead of the government of the United States, and also that the Constitution of the Confederate States should be published as a part of the Code. We are also informed that:

"It is but an act of justice to the publisher to state that the typographical errors which appear in the book are mainly attributable to the frequent change of printers during the progress of its publication, resulting from the excited and unsettled state of our national affairs. No less than eleven printers, who were at one time or another engaged in the printing of the Code, are now in the service of the Confederate States."

These facts are gathered from the preface of perhaps the first volume of the first edition of this ancient Code, which was issued in 1861 from the press of the Crusader Book & Job Office, conducted by John H. Seales, of Atlanta, Ga. It is the volume once owned and annotated in his own handwriting by the illustratious Chief Justice Lumpkin, and was doubtless presented to him by his son-in-law, the famous codifier. It was purchased by the writer, when a very young man, at the sale after his death of the library of E. P. Lumpkin, one of the sons of Georgia's first chief justice. The report of the committee of the Legislature which recommended the act of adoption in this stormy epoch of legal evolution seems pertinent to the present inquiry. It is printed in the preface of this historic volume. "If the Code now presented," reads the report, "were a new system of jurisprudence, or had the commissioners attempted to graft upon our system any new features extracted from others, and unharmonious with our own, or even if alterations in a well-defined public policy had been attempted, your committee would have paused, hesitated to recommend the mode of adoption suggested, without at least calling the special attention of the Legislature to each of the new and essential changes. But at an early date of our revision and examination, the codifiers announced the leading principle, by which they had attempted to guide their laborers, and your committee report the same prominent in all the amendments and changes made at their suggestion. This principle was, to admit no change or alteration in any well-defined rule of law, which had received legislative sanction, or judicial exposition. and to add no principle or policy which had received the condemnation of the former, or was antagonistic to the settled decisions of the latter." The provisions of the Code now of force differ in no respect from those of the first Code, except in this sentence:

"The life may be that of the assured, or of another (even if a slave) in whose continuance the assured has an interest."

The language of the section relied upon by Max Alexander is identical with that of the first Code, and, as we have seen, that "no alterations in a well-defined public policy" "no change or alteration in any well-defined rule of law which had received legislative sanction, or judicial exposition" "would have been approved" by the committee, upon whose report the Code as it stands to-day was adopted, the second provision stands in totidem verbis written in the original codification.

We have, therefore, but to consider the general principles of law and public policy on this topic as they were understood at the time of the adoption of the Code and since then to discover that Georgia has at no time attempted by legislation to adopt a policy at variance with those principles as they relate to insurance policies where no insurable interest is concerned. There is no room for construction or interpretation in the clear and unambiguous language of the great lawyers who framed these provisions. "The life may be that of the assured, or of another in whose continuance the assured has an interest." This is no departure from general law. Equally in harmony with that law are the unequivocal provisions "that the assured may direct the money to be paid to his personal representative. or to his widow, or to his children, or to his

assignee, and upon such direction given and assented to by the insurer no other person can defeat the same, but the assignment is good without such assent." It is impossible upon any principle of construction to hold, because payment may be directed to an assignee, that this avoids a settled principle, at least in the courts of the United States, that the assignee himself must be qualified to receive payment. To argue that these lucid words of the statute import that payment may be made to any assignee whatever would make valid every assignment to pay a gambling debt, an assignment by a wife of a policy on her life to pay the debt of her husband, or an assignment for any other consideration, however openly and palpably it might violate the settled principles of the general law. What warrant, then, is there for a construction which is to write into the statute a provision of which there is not the slightest evidence of legislative intention? The whole argument for the alleged assignee is that because, forsooth, the statute authorizes payment to an assignee—an authorization which every other statute of every other state, and every judicial decision, approves—it must also mean that payment may be made to an assignee who has no insurable interest, when such payment is held plainly inimical to the general law and to public policy. It seems, then, that since the statutory law of the state is merely silent on this topic, unless there are other cogent considerations advanced in behalf of Max Alexander, the general law which makes an insurable interest in the assignee essential to the validity of the assignment must control our action here.

It is, however, urged that the United States courts must surrender the right to make an independent judgment upon this subject, for the reason, as insisted, that the supreme appellate court of the state, construing the statute, have held that in Georgia an insurable interest is not necessary to such assignments. Were it apparent that the Supreme Court of the state had construed and not amended the statute, it is not clear that upon this question a national court would be bound by such construction. It is true that there is some conflict of authority upon this subject, but the true rule is believed to be expressed in Hartford Fire Insurance Co. v. Chicago, etc., R. R. Co., 175 U. S. 100, 20 Sup. Ct. 37, 44 L. Ed. 84, in the language following:

"Questions of public policy, as affecting the liability for acts done, or upon contracts made and to be performed within one of the states of the Union—when not controlled by the Constitution, laws, or treaties of the United States, or by the principles of the commercial or mercantile law, or of general jurisprudence of national or universal application—are governed by the law of the state as expressed in its own Constitution and statutes, or declared by its highest court."

See, also, Rev. St. § 721 [U. S. Comp. St. 1901, p. 581]; 4 Fed. St. Ann. p. 524, and authorities cited; Carpenter v. Providence Washington Insurance Co., 16 Pet. 495, 10 L. Ed. 1044; Watson v. Tarpley, 18 How. 517, 15 L. Ed. 509; U. S. v. Muscatine, 75 U. S. 575, 19 L. Ed. 490; Manhattan Life Insurance Co. v. Hennessy, 99 Fed. 64, 39 C. C. A. 625. We inquire, then, is a controversy like this, relating to a contract of insurance, within the scope of the commercial or mercantile law, or general jurisprudence of national or universal application? Upon this we have the high authority of the Supreme Court.

of the United States announced in Carpenter v. Providence Washington Insurance Co., supra, and the opinion as rendered by Mr. Justice Story. "The questions under our consideration," said that great jurist, "are questions of general commercial law, and depend upon the construction of a contract of insurance, which is by no means local in its character, or regulated by any local policy or custom. Whatever respect, therefore, the decisions of state tribunals may have on such a subject, and they certainly are entitled to great respect, they cannot conclude the judgment of this court. On the contrary, we are bound to interpret this instrument according to our own opinion of its intent and objects, aided by all the lights which can be obtained from all external sources whatsoever; and, if the result to which we have arrived differs from that of these learned state courts, we may regret it, but it cannot be permitted to alter our judgment." And 39 years later, in Oates v. National Bank, 100 U. S. 246, 25 L. Ed. 580, Mr. Justice Harlan, for the Court, declared:

"While the federal courts must regard the laws of the several states and their construction by the state courts (except when the Constitution treaties, or Statutes of the United States otherwise provide) as rules of decision in the courts of the United States, in cases when applicable, they are not bound by the decisions of their courts upon questions of general commercial law. Such is the established doctrine of this court, so frequently announced," etc.

Whatever may have been said to the contrary, wherever possible, the courts of the United States invariably accord the profoundest respect to the conclusions of the state courts. They follow blindly their construction of a state statute, which is entirely local in character. Their rules of property within the state, particularly as to real estate, are also invariably adopted. It is, however, true that when a statute of a state is merely declaratory of a general principle of commercial jurisprudence, is clear and unambiguous in its terms, and the state court by apparent construction, with definiteness and precision, writes into the statute a fundamental change in such general law, the courts of the United States will not on that account forego their settled duty to render independent judgments on such general law.

The latest decision on this topic, made by the Supreme Court of Georgia, is Rylander v. Allen, 125 Ga. 206, 53 S. E. 1032. The opinion was rendered by Chief Justice Fish, and is written with his well-known forcefulness and ability. It is there expressly held that:

"One has the right to procure insurance on his own life and assign the policy to another, who has no insurable interest in the life insured, provided it be not done by way of cover for a wager policy."

This case was decided March 28, 1906, less than a year ago, and the learned chief justice states that "this exact question has never been decided by this court." He quotes Civil Code 1895, §§ 2114, 2116, supra. A distinct expression of the court's conclusion will be found on page 208 of the opinion. It is in the approval of an extract from the opinion of Mr. Justice Little, in Union Fraternal League v. Walton, 109 Ga. 1, 34 S. E. 317, 46 L. R. A. 424, 77 Am. St. Rep. 350. In delivering the opinion for the majority of the court, Mr. Justice Little had said:

"By section 2116 of the Civil Code it is provided that the assured may direct the money to be paid to his personal representative, or to his widow, or to his children, or to his assignee. * * * We are aware that there is seemingly irreconcilable conflict between the adjudicated cases as to whether the assignee of a life policy takes anything under the assignment unless he has an insurable interest in the life insured. But it will be noted that under the provisions of our Code no such qualifications are made essential to the validity of the assignment, nor do we think under sound reasoning any can exist."

Now, I must state with great deference, and with the profoundest respect for all the eminent judges of our state who have agreed on this subject, that the section of the Code quoted was not designed to define the qualifications or requisites which make a valid assignment. The Supreme Court of the state seems to use these two sections of the local statutory law as a foundation for their argument, or "sound reasoning"—to use the language of Justice Little—that no insurable interest is required. It will, however, be easily perceived from the context, as set forth in the opinion of Justice Fish, that the entire argument is based upon the views of other courts, with which the Georgia court is in harmony on this mooted question, and that no construction or interpretation of the statute is attempted. It is simply stated by Justice Little, and restated by Justice Fish in the later case, that, under the provisions of the Georgia Code, the qualification of an insurable interest is not made essential to the validity of an assignment by the provisions of the Code. This may easily be granted. It is true that the Code contains much law, and much good law. It is probably a codification as valuable to the people of Georgia, as the Code of Napoleon to the people of France. It does not, however, purport to contain all the law, and, while the essentials of insurable interest are not embodied in the Code, there stands the general commercial law, and the controlling decisions of the Supreme Court of the United States, which declare that an insurable interest is essential to such assignments. On this topic the Georgia statutes are neither final, complete, nor conclusive. In fact, they are voiceless. This decision of the Georgia court, however, affords an argument on the general law in favor of the contention of Max Alexander as comprehensive and strong as that presented by any other court. It cites a multitude of state decisions with which it is in accordance. As many might be cited to the contrary. It is obvious that to discuss this conflict would be "labor ineptiarum." In support of the conclusion, Chief Justice Fish cites two decisions of the Supreme Court of the United States, which, if in point, would, of course, be controlling here. They are Ætna Life Insurance Co. v. France, 94 U. S. 510, 23 L. Ed. 401, and New York Mutual Life Insurance Co. v. Armstrong, 117 U. S. 591, 6 Sup. Ct. 877, 29 L. Ed. 997. The first of these differs in all respects from the case at bar. The policy had been taken out by Andrew J. Chew for the benefit of Lucetta P. France; Lucetta P. France was Chew's sister. Besides, the sister had loaned the brother some $2,400. The court below held that "such a policy is sustainable at law on account of the nearness of the relationship between the parties, and especially as Mrs. France, at the time the insurance was effected, was one of Chew's next of kin, prospectively interested in his estate as a distrib-

utee." "We concur," said Chief Justice Bradley for the Supreme Court, "in the construction of the policy made by the court, and in the validity of the transaction." The learned justice continues:

"As held by us in the case of the Connecticut Mutual Life Insurance Co. v. Schaefer, 94 U. S. 457, 24 L. Ed. 251, any person has a right to procure an insurance on his own life and to assign it to another, provided it be not done by way of cover for a wager policy."

In other words, Justice Bradley states that the great court had held the law to be precisely as stated by the letter of our Code. He continues, and this is the crucial point:

"Where the relationship between the parties, as in this case, is such as to constitute a good and valid consideration in law for any gift or grant, the transaction is entirely free from such imputation."

"Expressio unius exclusio alterius est." It would seem to follow from this statement of Justice Bradley that, where there is no relationship between the parties "such as to constitute a good and valid consideration in law for any gift or grant," the transaction is not "free from such imputation." If the proposition is true, the converse proposition would seem also true.

We turn to the Connecticut Mutual Life Insurance Co. v. Schaefer, the same volume, 94 U. S. 457, 24 L. Ed. 251, cited by the famous associate justice. We find the facts to be that a policy of insurance was effected by a husband and wife upon their joint lives, payable to the survivor on the death of either. Subsequently they were divorced a vinculo matrimonii. She, having thereafter paid the premiums to the time of his death, brought suit on the policy. This also, it will be observed, is not the case of an assignment. The court sustained the insurance, and the ruling was placed upon the ground that the parties had both an insurable interest at the time the insurance was effected. "It is well settled," said Mr. Justice Bradley, again speaking for the court, "that a man has an insurable interest in his own life, and in that of his wife and children, a woman in the life of her husband, and a creditor in the life of his debtor. Indeed, it may be said generally that any reasonable expectation of pecuniary benefit or advantage from the continued life of another creates an insurable interest in such life. And there is no doubt that a man may effect an insurance on his own life for the benefit of a relative or friend, or two or more persons, on their joint lives, for the benefit of the survivor or survivors. * * * The essential thing is that the policy shall be obtained in good faith, and not for the purpose of speculating upon the hazard of a life in which the insured has no interest." In the life of John R. Young Max Alexander had no interest. In his death Alexander's interest was great. In New York Mutual Life Insurance Co. v. Armstrong, supra, the remaining decision of the Supreme Court of the United States, cited by the Supreme Court of Georgia, the essentiality of an insurable interest was not discussed save by implication, and the implication is against Alexander's contention. The matter in issue was the ruling of the court below, excluding evidence of the fact that the policy had been taken out by fraud, and that the insured had been murdered to obtain its proceeds. The Supreme Court admitted the

evidence and denied the recovery, on the ground of that fraud and that murder. The essentials, or "qualifications"—to use the language of the Supreme Court of Georgia—to the validity of an assignment were not involved. Mr. Justice Field, however, who pronounced the opinion, used the following language:

"A policy of life insurance, without restrictive words, is assignable by the assured for a valuable consideration equally with any other chose in action, where the assignment is not made to cover a mere speculative risk, and thus evade the law against wager policies, and payment thereof may be enforced for the benefit of the assignee, and, under the system of procedure in many states, in his name."

This is the general law, and it is also the statutory law of Georgia, but the question remains: Is not an assignment of a life insurance policy like that before the court (not an endowment or tontine policy), to one who has no interest in the life of the assured, "a mere speculative risk" on the length of his life, and the chances of gain by his death? The word "speculative" in this sense is authoritatively defined to mean "disposed towards speculation, as distinguished from investment." There can be little doubt what the masterful comprehension of Mr. Justice Field regarded as a "speculative risk." In immediate sequence to the language just quoted, he cites authority in support of his proposition, and the first case cited is Warnock v. Davis, 104 U. S. 775, 780, 26 L. Ed. 924. We turn to this leading case, and there we find the proposition broadly and decisively stated:

"A person who has procured a policy of insurance on his life cannot assign it to parties who have no insurable interest in his life."

The decision was by a unanimous court. It was rendered at a time, when for copiousness and solidity of learning, for vigorous perspicacity, and for the facility with which it handled and disposed of questions of the gravest moment, the great court has scarcely been surpassed. The chief justice was Morrison R. Waite. His associates were Samuel F. Miller, Joseph P. Bradley, John M. Harlan, Stanley Matthews, Ward Hunt, William B. Woods, and Horace Gray, and, speaking for the court, there sat the jurist member of a family of four brothers, not inferior in the highest powers of the mind, to any other which has added to the accomplishments, or enhanced the fame of American character. Said Justice Field:

"The association had no insurable interest in the life of the deceased, and could not have taken out a policy in its own name. Such a policy would constitute what is termed a 'wager policy,' or a mere speculative contract upon the life of the assured, with a direct interest in its early termination."

Construing this extract from the opinion of Warnock v. Davis with that quoted above from the New York Mutual Life Insurance Co. v. Armstrong, it is easily discoverable that a mere speculative risk, and the assignment of a policy without insurable interest in the assignee, in the opinion of the Supreme Court import one and the same thing. Justice Field then proceeds with the definition of what constitutes such an insurable interest as will take the contract out of the class of wager policies:

"But in all cases there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary, of blood or affinity,

to expect some benefit or advantage from the continuance of the life of the assured. Otherwise the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured. Such policies have a tendency to create a desire for the event. They are, therefore, independently of any statute on the subject, condemned, as being against public policy."

The learned justice recognizes the strong diversity of opinion among the courts of the states on this most important question, but this does not disturb him, or the judgment of the controlling tribunal for which he speaks. It is also true that the astonishing advance in the commercialism of the country apparently has induced a difference between the Supreme Court of the United States and several text-writers of high character. A notable instance of this may be found in the fine work of Prof. Vance, Dean of the George Washington Law School in the District of Columbia, published in the useful and admirable Hornbook Series of the West Publishing Company. See Vance on Insurance, pp. 141–144. I do not think, however, that Prof. Vance attaches sufficient significance to what is perhaps the supreme task of the statesman and the jurist of our country, and that is the prevention of assassination and murder, and the education of the public to an appreciation of the value of human life. This is at once the most prevalent and portentous germ of character degradation among the American people. In little more than a generation three chief magistrates of the nation have been assassinated. In the mother country, save for the execution in a period of revolution of the first Charles, the life of no chief ruler has been successfully assailed since the Middle Ages. The statistics of murderous crimes in the United States are simply horrifying, and in many localities, while innumerable lives have been taken, no murderer with a tithe of influence and respectability has been executed for murder, even the most cruel and cowardly, within the memory of any man now alive. In this state and district a man of reputable antecedents is lying in jail, charged with murder to obtain the value of the dead man's insurance. Our population is rapidly becoming heterogeneous. Innumerable ercruits are yearly discharged upon our shores from countries where human life is of less value than the smallest premium upon the most trivial life policy. If to all of the encouragements and facilities for the commission of homicide which now exist the rule established by the Supreme Court shall be annulled, and a system for the issuance or assignment of life insurance policies shall be generally adopted, by which the party taking a policy, where the assignment is direct, is, in the language of Justice Field, "directly interested in the early death of the assured," not only will it have a tendency, as he says, "to create a desire for the event," but in a multitude of cases to make the event inevitable. Nor is the assignment of such a policy to one without an insurable interest less inimical to public policy than such a contract of insurance itself. "The assignment of a policy," said Mr. Justice Field, "to a party not having an insurable interest is as objectionable as the taking out of a policy in his name." Nor does it matter that the assignee acted in entire good faith. The rule is inexorable. In Warnock v. Davis, it is stated that:

"No fraud or deception upon any one was designed by the agreement, nor did its execution involve any moral turpitude. * * * To hold it valid for

the whole proceeds would be to sanction speculative risks on human life, and encourage the evils for which wager policies are condemned."

Warnock v. Davis is not the latest deliverance of the Supreme Court on this subject. In Crotty v. Union Mutual Insurance Co., 144 U. S. 623, 12 Sup. Ct. 749 (36 L. Ed. 566), Justice Brewer, for the unanimous court, announced:

"It is the settled law of this court that a claimant under a life insurance policy must have an insurable interest in the life of the insured."

This case was decided in 1891, and I find after careful examination of all the subsequent reports that the Supreme Court of the United States has not in any respect departed from this "settled law." The understanding I have reached as to this rule is strongly enforced by the opinion of Judge Shelby in the case of Manhattan Life Insurance Co. v. Hennessy, 99 Fed. 64, 39 C. C. A. 625, decided by the Circuit Court of Appeals of this circuit. In that case the policies in question were assignable by their express terms, and it was therefore, of course, "in the contemplation of the parties" that in case of assignment the amount of the policy should be paid to the assignee, but said Judge Shelby for the unanimous court, all the circuit judges sitting:

"The decisions of the New York Court of Appeals are to the effect that the assignee of the policy can collect and hold the proceeds even when he never had an insurable interest in the life of the insured. * * * But the Supreme Court does not approve this doctrine. The rule established by the latter court is that the assignee must have an insurable interest. His position must be such that the policy could have been legally issued payable to him."

And Judge Shelby cites Warnock v. Davis.

There is, moreover, I regret to discover, much evidence in this case which awakens grave suspicion as to the good faith and integrity of this claim. Alexander testifies that he paid Hyams, as agent for Young, $4,768 for this policy. At the time of the assignment $4,000 had been borrowed of the company by Young. This was the entire cash surrender value. While the policy was to be paid up in 20 years, it was not payable until the death of Young. There remained to be paid 16 annual premiums of $2,242 each, amounting to $25,872. There was also $200 interest on the loan, which interest at the maturity of the policy would have aggregated $3,200. This sum added to the premiums and the amount paid for the policy made a total of $43,840, which Alexander would have expended to carry the policy to maturity. The cash surrender value at maturity was only $35,900. This amount, reduced by the amount of the loan, would have made a net value to Alexander of $31,900, while he would have invested $43,840. In other words, had Young lived until the maturity of the policy, and had Alexander paid what he would have been obliged to pay, his loss on the transaction would have been $11,940. He claimed that at the end of the 20 years he would have received large dividends. This, however, is largely conjectural, and the average investor would scarcely rely upon uncertain dividends to compensate him for a certain outlay. Alexander denies that the fact the insured might die before the expiration of the 20-year period entered into the consideration of the transaction, but this is scarcely credible. It appears from the evidence that the assured was

a prominent and widely known man. He had large means, and was able at any time to obtain all the money he might need for his extensive business. A few months before the assignment he had passed through an exceedingly dangerous illness, during which his death was generally anticipated. These were matters of common knowledge in the community. He had long been one of the · foremost citizens of Savannah. He was a member of numerous clubs and societies, and a leader in important business enterprises. He was president and director of a prosperous naval stores company. Its assets were over a half million dollars in value. He was a director in one of the principal banks, and an important building and loan company. He was interested in other business enterprises. At the time of his death he was president of the Board of Trade of Savannah, and had previously held the same position. He had never married, and had very irregular habits in working, eating, and sleeping, and was very imprudent. At times he was quite dissipated, and used intoxicating liquors to excess. His face was very red, and on account of his prominence these facts were well known in the community. After recovering from his critical illness, which was an extreme and prolonged attack of pneumonia, he resumed his habits of dissipation to such an extent as to cause serious anxiety to his friends. Alexander, while disclaiming any intimacy with Young, said that he knew him, and sometimes met him in barber shops. In the safe deposit box of John R. Young his executors found a receipt for this policy of $50,000, dated August 30, 1902. This receipt was signed by Cornelius F. Moses, the local manager of the company, per M. Hyams, Jr. This indicated that the policy was to be forwarded to the company as security for the loan of $4,000. This was the first clue the executors obtained as to this important transaction. Hyams acted as the cashier of Moses, the local manager, and also solicited insurance. He is the principal witness for Alexander, and, like Alexander, had been an employé of the wholesale grocery house of S. Guckenheimer's Son, of Savannah. At first the executors could obtain no definite or satisfactory information with regard to the policy. Moses did no more than tell them that the policy had been sold, and that the insured at the time of his death had no interest in it. He at first declined to give the name of the purchaser, or give any other information on the subject. Later he disclosed to one of the executors that the purchaser was Max Alexander. It was stated that Alexander had purchased the policy through Moses' cashier, M. Hyams, Jr., who, it was alleged, was the agent or broker of Young in the transaction. No indorsed check, receipt, or other written evidence was produced to show the consideration paid Young for the assignment. This was written on a small printed form issued by the company. The signature and the figures in the number of the policy are in the handwriting of John R. Young. The other writing it contains, including the recital that Alexander was the assignee, is in the handwriting of Hyams. The witness to its execution was also Hyams. The instrument recites a nominal consideration of $1. Alexander testified that he did not know Mr. Young in the transaction at all. All his dealings were with Hyams, the alleged broker, who had been his friend for many years. Alex-

ander seems to have had some difficulty in gathering the purchase price. In making the payment, he gave Hyams two promissory notes for $1,000 each, one note for $1,200, a cashier's check on the Chatham Bank for $1,500, and a personal check for the remaining $68. These notes were not made payable to Young, but to Hyams. The cashier's check was payable to Alexander, and indorsed to Hyams. The check for $68 was payable to Hyams. The cashier's check for $1,500 was in evidence, but Alexander testified that he had destroyed the notes after they were taken up at maturity. At the time Alexander was 37 years old. He testified that he bought the policy purely as an investment, although he admits that Hyams suggested in the course of the negotiations that, in case of Mr. Young's death, the entire proceeds of the policy would be paid to him. It appears from the evidence that if he had at the time taken out a policy on his own life, for the same amount and under the same form of contract, it would have been a much better investment. It is true that Alexander put in evidence receipts for three annual premiums on the policy, to wit, for 1903, 1904, 1905, and three interest payments for $200 each on Young's $4,000 loan. But Young knew nothing of this. The premium and interest payment together amounted to $2,442 per year. This was $342 per year more than the salary for which he was working with Guckenheimer's Son. He claimed, however, to have had other means. Hyams testified that in the fall of 1902, when the $4,000 loan was made, Mr. Young asked him to sell the policy before the next premium fell due. He had no further communication with Mr. Young on the subject until after the policy was sold in May, 1903. He states that he tried to sell it to Mr. Arthur Weil; a wholesale merchant, and to Mr. S. Guckenheimer, Alexander's employer, but neither of them would buy. Later, he states, he approached Alexander, and succeeded in getting an offer from him for $4,768 for the policy. He states that after getting this offer he went to Mr. Young's office, and told him he could net him $695.22 for the policy. Young told him to come back a day or two later and he would let him know about it. He returned about 4 o'clock in the afternoon of April 20, 1902, and Young agreed to accept the $695.22. He then produced two copies of the printed assignment, which Mr. Young signed in blank in his presence, only filling in the policy number. He states this was done in Mr. Young's office, when only Young and Hyams were present, though several clerks were in the outer office. He cashed at the Chatham Bank the cashier's check for $1,500, given him by Alexander, and carried the currency to Mr. Young and paid him $695.22. He took Young's receipt for it. This receipt was not produced. Young did not ask him who was the assignee, and died without knowing it, so far as the witness could tell. The two notes for $1,000 each, one note for $1,200, given him by Alexander, Hyams indorsed to C. F. Moses, manager, who discounted them at the bank for him; he having no bank account. He collected from Alexander the amount of the discount, and paid it to Moses. He had no regular book of account with Moses, and got no money from him for the proceeds of the note, but simply made a memorandum of it on a small slip of paper, and put this in a little cash box in Moses' office, to which he as cashier had access. Thereafter,

from time to time as he needed money, he would take sums from the cash box and make a memorandum of it on this slip of paper. This course was pursued until the entire $3,200 was thus drawn. He claims to have acted as Young's agent or broker. Of the $4,768 received on account of his principal he retained a commission or brokerage of $3,072.78. He could not remember any reason why he paid $695.22 to Young. He might have paid any other arbitrary amount. According to his own statement, Hyams, if he was indeed the broker of Young, perpetrated a shocking fraud upon his principal. The fact that without acquainting Young he charged his unconscious principal the unconscionable commission of 87 per cent. for his services in the transaction as a broker, taken in connection with his intimacy with Alexander, would seem to demand the closest scrutiny of a court of conscience. Besides, his testimony is marked by a swiftness and boldness little short of effrontery. Young, he says, was satisfied with a sum which was less than 15 per cent. of the proceeds of his policy as sold. He would have been satisfied, Hyams said, with $100. He asked no questions. He was paid $695.22. When asked how this sum was calculated, Hyams said that he did not know, but that Young would have been satisfied with 22 cents. There is a baleful and sinister light on the whole transaction. It is plain from the high stations in business life attained by John R. Young in Savannah, one of the foremost ports of the nation, that he was endowed with clear business sagacity and a decisive character. Such a man would be as little likely as any other tamely to submit to such flagrant imposition. While his voice is silent, in view of his business character, it must be true that this transaction never occurred as stated, or else that he was in such decline, mentally and physically as well, that the participants could readily discover that he had but a little while to live. Besides, if the transaction was straight, what the necessity of keeping the facts from Young, why the circuitous methods of payment? Why not pay Young directly? Why make the notes and checks payable to Hyams? Why withhold from Young the true price paid for his property? Why deprive him of his right to know the commissions with which he is charged? Alexander, it is true, testifies that he was ignorant of this conduct on the part of Hyams, but he knew that he was buying the property of Young, and he knew that he was giving checks and notes to Hyams. This was enough to put him on inquiry, and he is chargeable with knowledge of all the fraud and wrong which on inquiry he might have ascertained. In truth, from his own testimony, and that of Hyams, in this whole transaction Hyams was acting much more in his interest than in the interest of Young. This clerk in a grocery store was making promissory notes, and undertaking to pay more per annum than his entire salary, in order to speculate on the life of the president of the Savannah Board of Trade. It is not difficult, with the policy and the blank transfer in Hyams' possession, to understand how readily the details of the scheme might have been perfected. As for Young, in the large transactions he constantly handled, it may be true that he did not care to maintain this policy, or he may have lost sight of it. It may be that Young, having met his loan by transferring the policy in blank with the cash surrender value, had no purpose to maintain the insur-

151 F.—19

ance. On this the evidence was silent. My own conclusion is that Young felt that he was dealing with the company; that Hyams, the cashier of Moses, the local manager, was its representative; and that Hyams gave him the impression that the money he received, if he received any at all, was the value of his policy over and above the loan for which he had pledged the policy as security. If, then, Alexander, Hyams, or Moses, or either or all of them, for unlawful speculative designs, paid the premiums and the interest on the note, the effect of this action was to keep alive the policy, not for their benefit, but for the benefit of the legal representatives of John R. Young.

It is safe to conclude that, not only every friend of John R. Young, but every business man of any consequence or any powers of observation in the city of Savannah, knew that the president of the Board of Trade had but a short time to live. Safely may we assume that none more clearly saw his precarious hold on life than men engaged in life insurance, especially the agents of those companies which had given him life insurance. The entire case as developed by the evidence is a signal instance of the wisdom of the rule hereinbefore discussed, which we have seen is established by reiterated decisions of the Supreme Court of the United States.

Counsel for the executors concede that Alexander should be repaid for all expenditures made by him on account of the policy, and the loan, with interest thereon. In view of this concession, decree will be taken accordingly. He will, therefore, suffer no loss. He will have his whole outlay with 7 per cent. interest. The insurance company has no complaint. It has paid the money into court, requested the determination of the court on the issues involved, asks its reasonable costs, and begs that it may be no longer disturbed. These prayers will be approved by the decree. Mr. Lawton, of counsel who presented this bill, suggested an allowance of $1,000 as his honorarium. That he has underestimated his services, the court is not able to perceive. There is no proof that his estimate is exorbitant, and the allowance will, therefore, be made. This is justified by the authorities. Louisiana State Lottery Co. v. Clark (C. C.) 16 Fed. 20; Trustees v. Greenough, 105 U. S. 535, 26 L. Ed. 1157.

Deducting these sums conceded to Alexander and allowed to counsel, together with the costs, from the fund in the hands of the court, decree will be taken determining the right of the executors to the balance of the sum deposited by the complainant in the registry of the court to the credit of this case.