CONNECTICUT MUTUAL LIFE INSURANCE COMPANY *v.*
SCHAEFER.

1. Within the scope of the professional employment of an attorney, the communications made to him by his client are privileged, and, without the consent of the latter, he should neither be required nor permitted by the courts of the United States to testify concerning them.

.2. A policy of life insurance originally valid does not cease to be so by the cessation of the assured party's interest in the life insured, unless such be the necessary effect of the provisions of the instrument itself. *So held*, where, subsequently to effecting an insurance by husband and wife, upon their joint lives, payable to the survivor on the death of either, they were divorced *a vinculo matrimonii*, and she, having thereafter paid the premiums to the time of his death, brought suit on the policy.

8 Any person has a right to procure an insurance on his own life, and assign it to another, provided it be not done by way of cover for a wager policy.

ERROR to the Circuit Court of the United States for the Southern District of Ohio.

The facts are set forth in the opinion of the court.

*Mr. Edgar M. Johnson* for the plaintiff in error.
*Mr. J. D. Brannan, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

This was an action on a policy of life assurance issued July 25, 1868, on the joint lives of George F. and Franzisca Schaefer, then husband and wife, payable to the survivor on the death of either. In January, 1870, they were divorced, and alimony was decreed and paid to the wife. There was never any issue of the marriage. They both subsequently married again, after which, in February, 1871, George F. Schaefer died. This action was brought by Franzisca, the survivor.

On the trial of the cause, several exceptions were taken by the defendant to the rulings and charge of the court, and this writ of error is brought to reverse the judgment for alleged error in said rulings and charge.

The first exception was for overruling certain testimony offered by the defendant. The plaintiff, having offered herself as a witness, on her cross-examination admitted that she had employed one Harris as her attorney to file her petition for divorce; and being questioned whether she had not stated to

him, to be embodied in the petition, that Schaefer had been a habitual drunkard for a period of more than three years prior to the date of filing the petition, denied that she had so stated to him. (Had such been the fact, it would have falsified the statement made in the application for insurance.) The defendant called Harris, and asked him whether the plaintiff had not so stated to him on that occasion. The question was objected to and overruled, as calling for confidential communications between attorney and client. The defendant alleges that herein the court erred, because, by the law of Ohio, such communications are not privileged. An examination of the Ohio statutes renders it doubtful whether the law is as the defendant contends. But if it were, the court did right to exclude the testimony. The laws of the State are only to be regarded as rules of decision in the courts of the United States where the Constitution, treaties, or statutes of the United States have not otherwise provided. When the latter speak, they are controlling; that is to say, on all subjects on which it is competent for them to speak. There can be no doubt that it is competent for Congress to declare the rules of evidence which shall prevail in the courts of the United States, not affecting rights of property; and where Congress has declared the rule, the State law is silent. Now, the competency of parties as witnesses in the Federal courts depends on the act of Congress in that behalf, passed in 1864, amended in 1865, and codified in the Revised Statutes, sect. 858. It is not derived from the statute of Ohio, and is not subject to the conditions and qualifications imposed thereby. The only conditions and qualifications which Congress deemed necessary are expressed in the act of Congress; and the admission in evidence of previous communications to counsel is not one of them. And it is to be hoped that it will not soon be made such. The protection of confidential communications made to professional advisers is dictated by a wise and liberal policy. If a person cannot consult his legal adviser without being liable to have the interview made public the next day by an examination enforced by the courts, the law would be little short of despotic. It would be a prohibition upon professional advice and assistance.

The other exceptions were to the charge of the court, and

relate to two points : first, to the forbearance note given for a portion of the last renewal premium ; and, secondly, to the alleged failure of interest of the plaintiff in the policy, caused by the divorce of the insured parties.

First, as to the forbearance note. Only one half of the annual premium was required to be paid in cash ; the insured, if they chose, could have a credit for the other half. This credit was given upon the assured's signing an acknowledgment in the following form : " I hereby acknowledge a credit or forbearance of —— dollars of the premium on my policy No. ——, which amount shall be a lien on said policy at six per cent per annum until paid or adjusted by return of surplus premium." It was not a note promising to pay money, but a form of acknowledgment by which the assured consented to a deduction from the policy for non-payment of a portion of the premium. As long as George F. Schaefer took any interest in the policy, he signed this acknowledgment for himself and wife, " George F. and Franz. Schaefer ; " or for himself alone. One premium became due after the divorce, and Franzisca Schaefer herself attended to the payment of it, — paying the cash portion, and authorizing her son by a former marriage to sign the forbearance note, as it is called. He did so in the name of both parties insured, thus : " Geo. F. & F. Schaefer." The company accepted it. On what valid ground they can now object to the transaction, it is difficult to see. A joint act was to be done. Only one of the parties could physically do it. Either had a right to do it. This act was, to pay or settle the annual premium. The plaintiff, as one of the joint parties, performed what was necessary to be done. George F. Schaefer could not complain ; for it was done in his interest, keeping the policy alive for his benefit as well as Franzisca's. The company could not complain ; for they accepted both the money and the acknowledgment in the form in which they were given. There is no pretence that any deception was practised upon them.

This point is really frivolous.

The other point, relating to the alleged cessation of insurable interest by reason of the divorce of the parties, is entitled to more serious consideration, although we have very little difficulty in disposing of it.

It will be proper, in the first place, to ascertain what is an insurable interest. It is generally agreed that mere wager policies — that is, policies in which the insured party has no interest whatever in the matter insured, but only an interest in its loss or destruction — are void, as against public policy. This was the law of England prior to the Revolution of 1688. But after that period, a course of decisions grew up sustaining wager policies. The legislature finally interposed, and prohibited such insurance: first, with regard to marine risks, by statute of 19 Geo. II. c. 37; and next, with regard to lives, by the statute of 14 Geo. III. c. 48. In this country, statutes to the same effect have been passed in some of the States; but where they have not been, in most cases either the English statutes have been considered as operative, or the older common law has been followed. But precisely what interest is necessary, in order to take a policy out of the category of mere wager, has been the subject of much discussion. In marine and fire insurance the difficulty is not so great, because there insurance is considered as strictly an indemnity. But in life insurance the loss can seldom be measured by pecuniary values. Still, an interest of some sort in the insured life must exist. A man cannot take out insurance on the life of a total stranger, nor on that of one who is not so connected with him as to make the continuance of the life a matter of some real interest to him.

It is well settled that a man has an insurable interest in his own life, and in that of his wife and children; a woman in the life of her husband; and the creditor in the life of his debtor. Indeed, it may be said generally that any reasonable expectation of pecuniary benefit or advantage from the continued life of another creates an insurable interest in such life. And there is no doubt that a man may effect an insurance on his own life for the benefit of a relative or friend; or two or more persons, on their joint lives, for the benefit of the survivor or survivors. The old tontines were based substantially on this principle, and their validity has never been called in question.

The essential thing is, that the policy shall be obtained in good faith, and not for the purpose of speculating upon the hazard of a life in which the insured has no interest. On this point, the remarks of Chief Justice Shaw, in a case which arose

in Connecticut (in which State the present policy originated), seem to us characterized by great good sense.   He says: —

"In discussing the question in this Commonwealth (Massachusetts), we are to consider it solely as a question of common law, unaffected by the statute of 14 Geo. III., passed about the time of the commencement of the Revolution, and never adopted in this State.   All, therefore, which it seems necessary to show, in order to take the case out of the objection of being a wager policy, is, that the insured has some interest in the *cestui que vie;* that his temporal affairs, his just hopes and well-grounded expectations of support, of patronage, and advantage in life, will be impaired; so that the real purpose is not a wager, but to secure such advantages, supposed to depend on the life of another; such, we suppose, would be sufficient to prevent it from being regarded as a mere wager.   Whatever may be the nature of such interest, and whatever the amount insured, it can work no injury to the insurers, because the premium is proportioned to the amount; and whether the insurance be a large or small amount, the premium is computed to be a precise equivalent for the risk taken.   We cannot doubt," he continues, "that a parent has an interest in the life of a child, and, *vice versa,* a child in the life of a parent; not merely on the ground of a provision of law that parents and grandparents are bound to support their lineal kindred when they may stand in need of relief, but upon considerations of strong morals, and the force of natural affection between near kindred, operating often more efficaciously than those of positive law." *Loomis* v. *Eagle Life Insurance Co.,* 6 Gray, 399.

We concur in these views, and deem it unnecessary to cite further authorities, all those of importance being collected and arranged in the recent treatises on the subject.   See May on Insurance, sects. 102–111; Bliss on Life Insurance, sects. 20–31.

The policy in question might, in our opinion, be sustained as a joint insurance, without reference to any other interest, or to the question whether the cessation of interest avoids a policy good at its inception.   We do not hesitate to say, however, that a policy taken out in good faith, and valid at its inception, is not avoided by the cessation of the insurable interest, unless such be the necessary effect of the provisions of the policy itself. Of course, a colorable or merely temporary interest would present circumstances from which want of good faith and an intent to evade the rule might be inferred.   And in cases where the

insurance is effected merely by way of indemnity, as where a creditor insures the life of his debtor, for the purpose of securing his debt, the amount of insurable interest is the amount of the debt.

But supposing a fair and proper insurable interest, of whatever kind, to exist at the time of taking out the policy, and that it be taken out in good faith, the object and purpose of the rule which condemns wager policies is sufficiently attained; and there is then no good reason why the contract should not be carried out according to its terms. This is more manifest where the consideration is liquidated by a single premium paid in advance, than where it is distributed in annual payments during the insured life. But, in any case, it would be very difficult, after the policy had continued for any considerable time, for the courts, without the aid of legislation, to attempt an adjustment of equities arising from a cessation of interest in the insured life. A right to receive the equitable value of the policy would probably come as near to a proper adjustment as any that could be devised. But if the parties themselves do not provide for the contingency, the courts cannot do it for them.

In England, by the operation of the statute of 14 Geo. III., as construed by the courts, the law has assumed a very definite form. In a lucid judgment delivered by Baron Parke in the Exchequer Chamber, in the case of *Dalby* v. *Life Insurance Company*, decided in 1854, 15 C. B. 365, it was held that the true meaning of the statute is, that there must be an interest at the time the insurance is effected, but that it need not continue until death; the words of the statute being, " that no insurance shall be made on a life or lives wherein the assured shall have no interest, or by way of gaming or wagering," and " that in all cases where the insured hath interest in such life, &c., no greater sum shall be recovered than the amount or value of the interest." The word " hath " was construed as necessarily referring to the time of effecting the insurance, and not to the time of the death; that being the only construction which would subserve the object of the statute to discourage wagering, render the contract uniform and certain, and preserve a fixed relation between the premiums and the amount insured,

as required by the principles of life assurance. This case over-ruled the previous case of *Goodsall* v. *Boldero*, 9 East, 72, decided by Lord Ellenborough, in which, proceeding upon the idea that life insurance is a mere contract of indemnity, it was held that the interest must continue until death, and even until the bringing of the action. Baron Parke, in commenting upon this case, very justly says : —

"Upon considering this case, it is certain that Lord Ellenborough decided it upon the assumption that a life policy was in its nature a mere contract of indemnity, as policies on marine risks, and against fire, undoubtedly are; and that the action was, in point of law, founded on the supposed damnification, occasioned by the death of the debtor, existing at the time of the action brought; and his lordship relied upon the decision of Lord Mansfield in *Hamilton* v. *Mendes*, 2 Burr. 1270, that the plaintiff's demand was for an indemnity only. Lord Mansfield was speaking of a policy against marine risks, which is, in its terms, a contract for indemnity only. But that is not the nature of what is termed an assurance for life : it really is what it is on the face of it, — a contract to pay a certain sum in the event of death. It is valid at common law ; and, if it is made by a person having an interest in the duration of the life, it is not prohibited by the statute."

As thus interpreted, we might almost regard the English statute as declaratory of the original common law, and as indicating the proper rule to be observed in this country where that law furnishes the only rule of decision.

Be this, however, as it may, in our judgment a life policy, originally valid, does not cease to be so by the cessation of the assured party's interest in the life insured.

*Judgment affirmed.*