UNITED STATES ex rel. ATTORNEY GENERAL v. LOUISVILLE & N. R. CO.

(District Court, W. D. Kentucky. March 25, 1914.)

1. COMMERCE (§ 87*)—MANDAMUS—PERFORMANCE OF DUTY BY CARRIERS ENGAGED IN INTERSTATE COMMERCE—STATUTORY PROVISIONS.

Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 386 [U. S. Comp. St. 1901, p. 3169]) § 20, authorizing the court on application to compel by mandamus a carrier within the Interstate Commerce Act to comply with the provisions thereof, does not confer on the court power to compel by mandamus, in aid of an investigation by the Interstate Commerce Commission pursuant to a resolution of the Senate requiring the investigation, a railroad to disclose the amount of stocks and bonds of another railroad company it owns or controls, and whether the two railroads serve the same territory in whole or in part, and whether, under separate ownership, they will be competitors, and other facts showing further relations between the two railroads, and showing whether such relations restrict competition and maintain fixed rates; since the investigation does not relate to interstate commerce as regulated by the Interstate Commerce Act, but relates perhaps to other legislation, such as the anti-trust act.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 139; Dec. Dig. § 87.*]

2. COMMERCE (§ 87*)—MANDAMUS—PRIVILEGED COMMUNICATIONS.

Mandamus will not lie under Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 386 [U. S. Comp. St. 1901, p. 3169]) § 20, to compel

a disclosure of privileged communications between an individual and his counsel.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 139; Dec. Dig. § 87.*]

3. STATUTES (§ 263*)—CONSTRUCTION—RETROSPECTIVE EFFECT.
Statutes are presumptively prospective in operation, and courts will refuse to give them a retrospective effect, unless the intention to the contrary is so clear and positive as by no reasonable possibility to admit of any other construction.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 344, 349; Dec. Dig. § 263.*]

4. COMMERCE (§ 87*)—MANDAMUS—PRODUCTION OF PAPERS—DISCRETION OF COURT—STATUTORY PROVISIONS.
Where the petition for mandamus under the Hepburn Act (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1911, p. 1284]), authorizing the Interstate Commerce Commission to require the production of accounts, records, and memoranda, demands the production of papers which had their origin before the act, and the allegations of the petition are vague with respect to what papers should be produced, so that the court may not see what portions of the papers may be privileged communications between attorney and client and what not, or what part of them may be within the Interstate Commerce Act and what not, the court in its discretion will refuse the writ.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 139; Dec. Dig. § 87 *]

Mandamus by the United States, by its Attorney General, against the Louisville & Nashville Railroad Company. Dismissed, without prejudice.

George Du Relle, Dist. Atty., of Louisville, Ky., and P. J. Farrell, of Washington, D. C., for the United States.

Henry L. Stone, Helm Bruce, and E. S. Jouett, all of Louisville, Ky., for Louisville & N. R. Co.

EVANS, District Judge. The act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), after providing (section 1) that it shall apply to any common carrier or carriers engaged in the transportation of passengers or property from one state or territory of the United States or the District of Columbia to any other state or territory of the United States or to any adjacent foreign country, but that its provisions should not apply to the transportation of passengers or property wholly within any state, provides that all charges for such transportation shall be reasonable and just, that all classifications of property for transportation shall be just and reasonable, and (sections 2 and 3) that unjust discrimination shall be unlawful, and that no undue or unreasonable preference shall be given to any shipper, and (section 5) that it shall be unlawful to pool freights, and the Interstate Commerce Commission is given authority to determine questions of competition or possible competition. By section 6 it is provided that certain schedules of rates, fares, and charges shall be filed and established, and that due notice thereof shall be given. Section 6 also provides that every common carrier subject to the act shall file with the Interstate Commerce Commission copies

of all contracts, agreements, or arrangements with other common carriers of any arrangements affected by the act, and also provides that no common carrier shall engage in such transportation unless it files and publishes such schedules of rates. The Interstate Commerce Commission established by the act is given wide and extensive powers, among which (section 12) is the authority to inquire into the management of the business of all common carriers subject to the provisions of the act, and the commission is required to keep itself informed as to the manner and method in which such business is conducted, with the right to obtain from such common carriers full and complete information necessary to enable the commission to perform the duties and carry out the objects for which it was created, and upon the request of the commission it is made the duty of the district attorney of the United States to whom it may apply to institute in the proper court necessary proceedings for the enforcement of all the provisions of this act for the punishment of all violations thereof. By section 20 the commission is authorized to require from all carriers subject to the act annual reports, and it may prescribe the method of making them, and such annual reports are required to show in detail its capital stock and many other items specified in that section. This section further provides that the commission may, in its discretion, prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers subject to the provisions of the act including the accounts, records, and memoranda of the movement of traffic as well as receipts and expenditures of money. The commission is authorized at all times to have access to all accounts, records, and memoranda kept by carriers subject to the act, and it is provided that it shall be unlawful for such carriers to keep any other accounts, records, or memoranda than those prescribed or approved by the commission, and the commission is authorized to employ special agents or examiners who shall have authority under the order of the commission to inspect and examine any and all accounts, records, and memoranda kept by such carriers. The section prescribes penalties for the failure on the part of the carrier to keep such accounts, records, and memoranda on such books as may be prescribed by the commission or for a refusal to submit such accounts, records, or memoranda as are kept to the inspection of the commission or any of its authorized agents or examiners. This section contains a clause which reads thus:

"That the Circuit and District Courts of the United States shall have jurisdiction, upon the application of the Attorney General of the United States at the request of the commission, alleging a failure to comply with or a violation of any of the provisions of said act to regulate commerce or of any act supplementary thereto or amendatory thereof by any common carrier, to issue a writ or writs of mandamus commanding such common carrier to comply with the provisions of said acts or any of them."

On February 7, 1914, the United States by its Attorney General filed in this court a petition in which, among other things, it is alleged:

"That by section 12 of said act, as amended, said commission is authorized and required: To inquire into the management of the business of all common carriers subject to the provisions of said act, to keep itself informed as to the manner and method in which said business is conducted; to obtain from such common carriers full and complete information necessary to enable

said commission to perform the duties and carry out the objects for which it was created; and to execute and enforce the provisions of said act.

"That by said section 12 it is provided that, upon the request of said commission, it shall be the duty of any district attorney of the United States to institute in the proper court and to prosecute under the direction of the Attorney General of the United States all necessary proceedings for the enforcement of the provisions of said act and for the punishment of all violations thereof.

"That on the 6th day of November, 1913, a resolution was considered by unanimous consent in the Senate of the United States and agreed to by said Senate, in words and figures as follows, to wit:

## "Resolution.

"Resolved, that the Interstate Commerce Commission be, and the same is hereby, directed to investigate, taking proof and employing counsel if necessary, and report to the Senate as soon as practicable:

"First. What amount of stock, bonds, and other securities of the Nashville, Chattanooga & St. Louis Railway is owned or controlled by the Louisville & Nashville Railroad.

"Second. What other railroad or railroads in the territory served by the Louisville & Nashville Railroad and the Nashville, Chattanooga & St. Louis Railway have been purchased, leased, controlled, or arrangements entered into with, for the purpose of controlling by either the Louisville & Nashville Railroad or the Nashville, Chattanooga & St. Louis Railway.

"Third. Whether the Louisville & Nashville Railroad and the Nashville, Chattanooga & St. Louis Railway serve the same territory in whole or in part, and whether, under separate ownership, they would be competitive to the various points in their territories.

"Fourth. Any other fact or facts showing or tending to show the further relations between the Louisville & Nashville Railroad and the Nashville, Chattanooga & St. Louis Railway, and any fact or facts showing or tending to show whether these relations restrict competition and maintain fixed rates.

"Fifth. The terms of the lease of the Nashville & Decatur Railroad by the Louisville & Nashville Railroad, and what amount, if any, of stock, bonds, and other securities of the Nashville & Decatur Railroad and of the Lewisburg & Northern Railroad are owned by the Louisville & Nashville Railroad or any of its subsidiaries or holding companies.

"Sixth. Whether the Nashville & Decatur Railroad, the Lewisburg & Northern Railroad, and the Louisville & Nashville Railroad serve the same territory in whole or in part, and whether, under separate ownership, these railroads would be competitive between various points in their territories.

"Seventh. Any other fact or facts showing or tending to show the further relations between the Louisville & Nashville, the Nashville & Decatur Railroad, and the Lewisburg & Northern Railroad, and any fact or facts showing or tending to show whether these relations restrict competition and maintain and fix rates.

"Eighth. Any fact or facts showing or tending to show: (a) The relations between the Louisville & Nashville Railroad, the Nashville, Chattanooga & St. Louis Railway, the Tennessee Midland Railroad, the Tennessee, Paducah & Alabama Railroad, and any other railroads that have been purchased or leased by either or both of said railroad companies, and whether such relations restrict competition and maintain and fix rates; and (b) whether the lease of the Western & Atlantic Railroad by the Nashville, Chattanooga & St. Louis Railway from the state of Georgia, and the arrangement made between the Louisville & Nashville and the Nashville, Chattanooga & St. Louis Railroad, by which the former uses the tracks of the said Western & Atlantic Railway, restrict competition, restrain trade, and determine and fix rates.

"Ninth. Any fact or facts showing or tending to show whether the ownership of the Louisville & Nashville Railroad and the Nashville, Chattanooga & St. Louis Railway of any railroad terminals or terminal companies, steamboats and steamboat lines upon the Cumberland and Tennessee rivers, and any dock or dockyards at Pensacola, New Orleans, Mobile, or other seaport,

establishes a monopoly and restricts competition and determines and fixes rates.

"Tenth. Any fact or facts showing or tending to show whether an agreement or arrangement has been entered into between the Louisville & Nashville and other railroad companies for the purpose of preventing competition from entering into any of the territory served by the Louisville & Nashville Railroad, in consideration of the Louisville & Nashville Railroad agreeing not to enter into certain other territory, or in consideration of any other agreement or arrangement.

"Eleventh. What amount of stock, if any, the Atlantic Coast Line, or Atlantic Coast Holding Company owns in the Louisville & Nashville Railroad, and in the Atlantic Coast Line, and whether the ownership by such holding company of a majority of stock in both of the aforesaid railroads tends to restrict competition and maintain and fix rates.

"Twelfth. What amount, if any, the Louisville & Nashville Railroad, the Nashville, Chattanooga & St. Louis Railway, the Nashville & Decatur Railroad, and the Lewisburg & Northern Railroad, all or any of them, have subscribed, expended, or contributed for the purpose of preventing other railroads from entering any of the territory served by any of these railroads for maintaining political or legislative agents, for contributing to political campaigns, for creating sentiment in favor of any of the plans of any of said railroads. And

"Thirteenth. (a) The number of free annual passes; (b) the number of free-trip passes; (c) the number of every kind of free passes issued by each of said railroads each year since January first, nineteen hundred and eleven, to members of legislative bodies and other public officials; (d) the total mileage traveled upon free passes issued under each of the above classifications; and (e) the amount in money the free passes issued under each of the above-mentioned classifications would equal at the regular rates for such service of each of the above-named railroads.

"That prior to the times hereinafter mentioned said commission, for the purpose of enabling it to perform the duties imposed upon it by said act as aforesaid, duly appointed two special agents and examiners, namely, Will H. Carleton and Paul H. Lawrence, and duly authorized them to inspect and examine the accounts, records, and memoranda of said defendant, and said Carleton and Lawrence continuously since said appointment have been and still are duly appointed and authorized agents and examiners of said commission with authority as aforesaid.

"That heretofore, to wit, on the 4th day of February, 1914, the said commission by and through said Carleton, agent and examiner as aforesaid, applied to and made demand of said defendant and to and of its first vice president, W. L. Mapother, the officer of said defendant in charge and control of the accounts, records, and memoranda of said defendant, and to and of other officers and agents of said defendant for access to and opportunity to examine the accounts, records, and memoranda kept by said defendant prior to August 28, 1906, and the said defendant and said Mapother, vice president as aforesaid, and said other officers and agents of defendant failed and refused to comply with the provisions of said act to regulate commerce and violated the provisions of said act, and failed and refused to give either to said commission or to said Carleton, agent and examiner as aforesaid, access to or opportunity to examine said accounts, records, and memoranda of said defendant made prior to said August 28, 1906.

"And that heretofore, to wit, on February 4, 1914, said commission, by and through said Carleton, agent and examiner as aforesaid, applied to and made demand of said defendant and to and of its first vice president, W. L. Mapother, the officer of said defendant in charge and control of the accounts, records, and memoranda of said defendant, and to and of other officers and agents of said defendant for access to and opportunity to examine the accounts, records, and memoranda kept by said defendant on and subsequent to said August 28, 1906, including the correspondence received by said defendant on and subsequent to said date and copies of the correspondence sent out by said defendant on and subsequent to said date, and also the indexes pertaining to said correspondence and copies of correspondence, and that

said defendant and said Mapother, vice president as aforesaid, and said other officers of said defendant, failed and refused to comply with the provisions of said act to regulate commerce and violated the provisions of said act, and failed and refused to give either to said commission or to said Carleton, agent and examiner as aforesaid, access to or opportunity to examine said accounts. records, and memoranda of said defendant, that is to say, that said defendant and its said officers and agents failed and refused to give either to said commission or to said Carleton, agent and examiner as aforesaid, access to or opportunity to examine said correspondence received by said defendant on and subsequent to said August 28, 1906, or the copies of correspondence sent out by said defendant on and subsequent to said date, or the indexes kept with respect to said outgoing and incoming correspondence by said defendant, and said defendant and its said officers and agents failed and refused to give either to said commission or to said Carleton, agent and examiner as aforesaid, access to or opportunity to examine other accounts, records, and memoranda of said defendant made on and subsequent to said August 28, 1906.

"That in pursuance of said commission's duty under the law and in obedience to said resolution of the Senate hereinbefore set out, and to enable said commission to perform the functions for which it was created, it became and was the duty of said commission to obtain access to and to examine, by and through its special agents and examiners as aforesaid, all of said accounts, records and memoranda, including said correspondence, copies of correspondence, and indexes thereto, and it became and was the duty of said defendant and its officers and agents to give access to said commission and its agents and examiners to said accounts, records, memoranda, correspondence, copies of correspondence, and indexes, and to give to said commission and said agents and examiners opportunity to examine and inspect said accounts, records, memoranda, correspondence, copies, and indexes.

"Wherefore plaintff prays the court to issue a writ of mandamus commanding said Louisville & Nashville Railroad Company, common carrier as aforesaid, to comply with said provisions of said acts of Congress, and to give access to the accounts, records, and memoranda of said defendant and the said correspondence, copies of correspondence, and indexes thereto, and to afford opportunity to examine the same to said commission and its said agents and examiners, and to give such access to and opportunity to examine the said accounts, records, and memoranda made and kept by and for said defendant both before, on, and subsequent to August 28, 1906, including correspondence, copies of correspondence, and indexes thereto, and other indexes to said accounts, records, and memoranda, and plaintiff prays for all proper relief."

The defendant's answer contains four separate paragraphs, each of which states a separate matter of defense. Their substance may, we think, be succinctly, and for the present purpose sufficiently, stated as follows:

First. The first paragraph, after certain denials, states facts upon which the defendant insists that it had exhibited to the agent of the Interstate Commerce Commission all the accounts, records, and memoranda and other papers which the law required it to show, and had withheld none which it was its duty to exhibit. It avers that it was not required to do so, and for that and other reasons it did not exhibit various papers described in general terms which the law did not require it to show the examiner, many of which were privileged communications between the various departments of its official work, including those between the defendant and its attorneys, but which had no relation to anything coming within the act.

Second. The defendant, in paragraph 2 of its answer, pleads exemption under the fourth of the articles of amendments to the Constitution of the United States from the searches sought to be made by the examiner upon the ground that those searches are unreasonable.

Third. The third paragraph sets up the order of the Interstate Commerce Commission made on November 10, 1913, and which was served on defendant on November 13th, and which order directed certain steps to be taken in order to carry into effect the resolution passed by the Senate and set forth in plaintiff's petition. This order, it is claimed, has not been followed by the examiner in this instance.

Fourth. The answer endeavors to show that the defendant had fully complied with the demand of the commission and its examiner in respect to the free passes it had issued since January 1, 1911, by giving to the examiner a full exhibition of all the facts in respect thereto.

In the view we feel compelled to take of the case we think it unnecessary to dwell upon the defense set up in paragraph 2 of the answer in respect to the fourth amendment to the Constitution.

With equal brevity may we dispose of the fourth defense because it is admitted at the bar that, so far as the inquiry respecting the free passes is concerned, full and satisfactory information has been given to the examiner by the defendant.

[1] This leaves for consideration only the defense set up in the first and that set up in third paragraphs of the answer. We shall state with brevity our views upon each of these defenses, circumstances not favoring an elaborate discussion of them, even if that were necessary or desirable. Indeed, the third paragraph may be easily disposed of.

In the case of Hein v. Levee Com'rs, 19 Wall. at page 660, 22 L. Ed. 223, the Supreme Court, speaking through Mr. Justice Miller, said:

"Mandamus is essentially and exclusively a common law remedy and is unknown to the equity practice. But if this were otherwise it is the well settled doctrine of this court that the Circuit Courts can not use the writ of mandamus as an original and independent remedy, but are limited to its use as a process in the enforcement of rights when jurisdiction has been already acquired for other purposes."

This is the general rule, but the act to regulate commerce gives the court jurisdiction and power to issue writs of mandamus in certain cases for the enforcement of the act, but in no way can it be construed to confer upon the court power to enforce by that writ a resolution of the Senate alone; such resolution being no part of the act and not being a law of the United States. This was so obvious that the learned district attorney frankly admitted that the Senate resolution could not be enforced in that manner, and in open court disclaimed any purpose to seek relief upon that ground.

In these circumstances we may lay to one side the Senate resolution as such, though, if there can be found in it anything which also comes

within the provisions of the act to regulate commerce, the relief sought in this case might be grantable, even if the Senate resolution also contained it. A careful examination of the plaintiff's petition, the act to regulate commerce, and the Senate resolution has resulted in the conclusion that except in the thirteenth clause of the Senate resolution, which relates to the inquiry as to free passes issued, that resolution, under no admissible interpretation, relates to interstate commerce as regulated by the act. It relates possibly to other legislation, such as the Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), but not to the act regulating commerce between the states. This being so, that clause of the act to regulate commerce which gives the court power to issue writs of mandamus does not embrace a case outside the latter act.

As in the Harriman Case, 211 U. S. 417 et seq., 29 Sup. Ct. 115, 53 L. Ed. 253, it is claimed here that the general language of the act confers unlimited authority upon the Interstate Commerce Commission and its agents, whether or not the court can see how what is demanded affects interstate commerce. In the opinion in that case Mr. Justice Holmes gave a graphic description of the broad construction insisted upon by the commission, and indeed it must be confessed that much support to these claims has been given by the Supreme Court in other cases and by Congress. We think it not unlikely that there are few limits which can safely be fixed by the lower federal courts upon the operation of the clause of the act bestowing power upon the commission. Nevertheless, we think it clear that the Senate resolution, not being a law, cannot bring this case within section 20 of the act to regulate commerce in respect to the writ of mandamus. Whatever the Senate itself might do in other directions in order to obtain the information it desires, the courts have no authority to aid its resolution by issuing a writ of mandamus. This being so, we shall confine our examination to the question whether, when all that relates to the Senate resolution is taken out of the plaintiff's petition, anything sufficiently appears to entitle it to the relief it seeks. Several propositions may be considered as bearing upon the general result, and each will be briefly noticed.

[2] (a) The principle that communications between an individual and his counsel are privileged has been so often and so long held that it will take a court higher than this to upset so old, so necessary, and so wise a principle. That this principle is imbedded in our jurisprudence is clear from cases like Connecticut Mutual Life Ins. Co. v. Schaefer, 94 U. S. 458, 24 L. Ed. 251, and many others which might be cited. We need not further elaborate this proposition, but conclude that the fourth amendment to the Constitution and general principles of sound jurisprudence should prevent the issuing of any writ of mandamus which would require the production of papers or statements within the purview of the rule we have stated. The intention of Congress to abrogate the rule has not been made manifest and will not be presumed.

[3] (b) The question whether the provisions of the so-called Hepburn Act (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St.

Supp. 1911, p. 1284]), which authorizes the commission to require the production of accounts, records, and memoranda, should so far have a retrospective effect as to authorize the commission to enforce such production if the accounts, records, and memoranda were made previous to August 28, 1906, when the Hepburn Act went into effect, was argued with great ability. The general rule is that statutes are presumed to be prospective in operation, and the courts will refuse to give a retrospective effect to them unless the intention to the contrary is so clear and positive as by no reasonable possibility to admit of any other construction. But whether this general principle should be applied here admits of enough doubt to incline us to pass the question by, inasmuch as its definite settlement is not essential to the decision of the case.

[4] (c) But granting a writ of mandamus is always matter of sound discretion. To say the least, there certainly is grave doubt whether the court can compel the defendant to exhibit those papers to the commission which are ordinarily held to be privileged, such as communications between client and attorney.

There is grave doubt also whether a proper interpretation of the Hepburn Act should so far give it a retrospective operation at this late day as to authorize the court to compel the defendant to produce papers which had their origin before that act went into effect in August, 1906, and with all the allegations of plaintiff's petition in reference to the Senate's resolution eliminated, as we think should be and has been done, we have concluded that the writ of mandamus cannot be properly or discreetly based upon the extremely vague allegations which will then alone remain in the plaintiff's petition and which insist upon the production of all the papers as to which we have indicated the doubts just expressed.

It is difficult in these circumstances to see how there could be any such definite and distinct directions to the defendant as would guard its rights, while at the same time enforcing the performance of its duties. We think the court, in its discretion, should not grant the writ unless it can clearly and definitely define the duty it imposes upon the person it commands. This the court cannot do under the vague and general allegations of the petition. All these reasons combined have led us to the conclusion that the motion of the plaintiff should be denied.

We think, also, that the action should be dismissed. As already indicated, the allegations of plaintiff's petition are too meager and too vague, after everything in the case respecting the Senate resolution has been eliminated, to fairly afford a basis of any specific relief. If that pleading had stated with clearness, though necessarily in general terms, the exact records or papers of the defendant, an examination of which had been demanded and refused and so that the court might see from plaintiff's pleading or from the testimony what portions of them might (if the descriptions were accurate) be privileged and what not, or what part of them might be within the act and what not, we might be able to direct in a writ of mandamus what parts of such records should be exhibited to the examiner and

what not. But the meager, vague, and extremely general statements now remaining in the pleading, even when considered in connection with the testimony, do not disclose in adequate form information sufficient to enable the court to act in determining the questions of importance to which it is asked to respond. To grant the writ in the broad and general, not to. say unlimited, terms asked for might indeed uphold plaintiff's contention as to the powers of the Interstate Commerce Commission, but might be perilously near the unreasonable search forbidden by the Constitution. If the plaintiff had propounded claims to relief in such separately stated propositions as were based upon a. general but exact description of the class of records which had been demanded but which the examiner had failed to obtain, we might then be able to discriminate and grant such parts of the relief sought as appeared to be proper while denying the rest. But where the plaintiff asks an unlimited roving commission for the examiners without making such specific averments as will enable the court to discriminate in its judgment between what may be properly granted and what not, we think no title to any relief is made clear by the plaintiff, who must adequately and sufficiently show its claim to be well founded at least in part. Here such confusion exists between what might be good and what bad that the court does not think it discreet to grant the writ prayed for as the case is now presented.

Upon reasons such as we have indicated, while the action must be dismissed, it should be without prejudice, and the judgment will so provide. One may be prepared accordingly.