**DRANE et al. v. JEFFERSON STANDARD LIFE INS. CO. et al.**

No. 12928.

Court of Civil Appeals of Texas. Dallas.

Nov. 23, 1940.

Rehearing Denied Jan. 11, 1941.

Winfrey & Goldberg, of Dallas, for appellants.

Malone, Lipscomb, White & Seay and Hamilton, Lipscomb, Wood & Swift, all of Dallas, and Beauford H. Jester, of Corsicana, for appellees.

LOONEY, Justice.

This litigation arose as follows: The Jefferson Standard Life Insurance Company (a North Carolina corporation) issued two policies on the life of Miss Dorothy A. Drane; the first, for $5,510, was issued January 1, 1928, and the second, for $5,000, was issued January 7, 1937. There was attached to each policy a double indemnity rider, obligating the Company to pay "an additional amount equal to the face amount" of the policies, if the death of the insured should result from an accident, under the circumstances mentioned; also, each policy had attached a rider, providing that, "If the death of the Insured should occur prior to the maturity of this policy as an Endowment, the proceeds of this policy shall be paid in a series of equal monthly installments of $50.00 each, in accordance with Option No. 4 on the fourth page of this policy. These installments shall begin on January 7th, 1947, if the Insured dies on, or before that date, or immediately upon receipt of due proofs of the death of the Insured after that date. During any period while the proceeds of this policy are being retained by the Company following the death of the Insured, but prior to January 7th, 1947, interest thereon shall be accumulated at such rate as declared by the Directors of the Company, but not less than 3½% per annum compound interest, and any such accumulated interest shall be used to extend the period over which the installments of $50.00 each are paid. These installments shall be paid to Harry Eugene Ezell, Jr., friend of the Insured, if living on the due dates; otherwise to Harry Eugene Ezell, Sr., friend of the Insured, if living on the due dates. Any portion of the proceeds remaining with the Company without provision as to final disposition shall be payable to the executors, administrators or assigns of the last beneficiary who received benefits thereunder."

On September 20, 1937, Miss Drane was killed in an automobile accident, within the terms of the riders providing for double indemnity. She left a will in which her brother, Hugh A. Drane, was appointed independent executor; the will being duly probated, Mr. Drane qualified as independent executor. Harry Eugene Ezell, Jr., mentioned as beneficiary in the riders, being a minor, his father, Dr. Harry Eugene Ezell, mentioned as alternative beneficiary in the riders, was appointed and qualified as guardian of the person and estate of his son. Early in October, Mr. Drane, as independent executor, notified the Company that the proceeds of the policies belonged to the estate of Dorothy A. Drane, deceased, and, furnishing the Company with proofs of death, demanded payment. The Company was also notified by the Ezells that the proceeds of the policies belonged to Harry Eugene Ezell, Jr., under the riders hereinbefore set out, also furnished the Company with proofs of death, and demanded payment.

(Harry Eugene Ezell, Sr., mentioned as alternative beneficiary in the riders, claimed no interest in the policies; his disclaimer was made in open court and is a part of the statement of facts, pp. 96–97.)

The Insurance Company did not at any time deny its liability, and it seems that, until March 21, 1938, the rival claimants sought to reach a compromise settlement, but failing, the attorney for Mr. Drane, independent executor, on the date just named, notified the Company that efforts to compromise had proven fruitless, and on March 23, 1938, sued the Company on the policies, brought in as defendants Harry Eugene Ezell, Jr., Harry Eugene Ezell, Sr., in his individual capacity and as guardian of the person and estate of his son, alleging in detail the material facts as just outlined, and further that neither of the Ezells, senior or junior, has, or ever had, an insurable interest in the life of Dorothy Drane by reason of any relationship to her, either of consanguinity or affinity, or as a creditor, or by reason of any other fact; praying that the Ezells be decreed to have no interest whatever in the policies or the proceeds thereof, and that plaintiff, as independent executor of the estate of the insured, recover of and from the Company the face amount of the policies, and an additional amount equal to the face amount, under the double indemnity provisions, with interest; alleging

528

that the Company had failed to pay within thirty days after demand; prayed for 12% damages and a reasonable attorney's fee, as provided in Article 4736, R.C.S. Vernon's Ann.Civ.St. art. 4736, and for general relief.

The Insurance Company seasonably filed its petition for removal of the cause to the United States District Court for the Northern District of Texas, Dallas Division. In its petition for removal, the Company, among other things, alleged that, "the controversy, in so far as this defendant is concerned, consists of the mode and manner in which the proceeds of said policies should be paid; * * *." However, by agreement, the cause was remanded to the State court, one-half the costs incident to the removal being taxed against each of the rival claimants.

The pleading filed by the Company, after the cause was remanded to the State court, was in the nature of an interpleader, admitting the issuance and delivery of the policies, the death of the insured; alleged the rival claims made upon it for payment of the proceeds of the policies; that it had never "refused to pay the proceeds of said policies to the proper person, or persons, and in such manner and amounts as will be in accordance with its policy obligations, and will fully protect its interests in the premises, and it has, at all times, so informed the rival claimants to said funds.", and further that, "Your defendant here alleges that it is now, and at all times has been, ready, willing and able to carry out its policy obligations in full and to pay said sums, either in a lump sum or in accordance with the terms and provisions of said riders, to whomsoever this Court may determine is the proper person, and according to the method of payment which this Court may decree that such sums should be paid. That this defendant is further ready, willing and able to pay the proceeds of said policies into the registry of the Court in the event this Court should so decree, but it has not done so because of the controversy between the above parties as to the manner in which such payments should be made, as well as the proper person to whom they should be so paid." (Tr. p. 28.) The Company alleged further that, it was in great doubt as to who was entitled to the proceeds, and the manner in which they should be paid, disclaimed any interest in the funds and asked for an interpleader's fee (attorney's fee) in such amount as the court may decree.

The Ezells answered the suit and filed a cross action on the policies, alleging in detail the material facts heretofore outlined, also that, at the respective dates of issuance of the policies and continuously afterward to the death of Dorothy A. Drane, Harry Eugene Ezell, Jr., had an insurable interest in her life, in that their relationship during the entire time mentioned and at her death, was such as to create and show that he had a reasonable expectation of pecuniary benefits and advantages from the continued life of the insured, praying that the plaintiff, Hugh A. Drane, independent executor of the estate of the deceased, take nothing, and that the court enter its order and judgment, decreeing the payment of the proceeds of said policies of insurance to Harry Eugene Ezell, Jr., in conformity with the provisions of the respective riders attached to the policies involved, and that they recover against plaintiff all costs incurred, and for general relief, but did not seek recovery of the statutory penalty of 12% damages, and attorney's fees.

The case was tried without a jury, resulting in a judgment in favor of Harry Eugene Ezell, Sr., guardian of the person and estate of Harry Eugene Ezell, Jr., and Harry Eugene Ezell, Jr., that they recover on their cross action of and from the Jefferson Standard Life Insurance Company the aggregate face amount of the policies, and an additional amount equal to the face of the policies, under the double indemnity riders, aggregating $21,020, together with interest, at such rate as shall be determined by the Board of Directors of defendant Company, but, in no event, to be less than 3½% per annum, compounded from September 27, 1937, and that said sum, together with interest, shall be paid to Harry Eugene Ezell, Jr., in equal monthly installments of $200 each, beginning on January 7, 1947.

The court also adjudged that, if Harry Eugene Ezell, Jr., should die before the total of said respective payments, together with interest as compounded, should be paid, any unpaid balance thereof shall be due and payable to the plaintiff Hugh A. Drane, as independent executor of the Estate of Dorothy A. Drane, deceased, as contingent beneficiary. The plaintiff and the Ezells excepted, gave notice of and duly perfected appeals.

The gravamen of the contention of appellant is that, the riders attached to the policies, naming Harry Eugene Ezell, Jr., beneficiary, are void, because he had no insurable interest in the life of Dorothy A. Drane, in that he was not related to her in any degree by either blood or marriage, was not legally or morally dependent upon her for support, and did not have a reasonable expectation of pecuniary benefits from the continued life of the insured; hence, that the court erred in awarding the proceeds of the policies to Harry Eugene Ezell, Jr., and in not awarding same to appellant.

As Harry Eugene Ezell, Jr., was not related to Miss Drane by either blood or marriage, or legally or morally dependent upon her for support, his claim of an insurable interest in her life must rest upon a reasonable expectation of pecuniary benefits from the continuation of her life.

■ Our attention has not been called to any authority denying the proposition that an insurable interest in the life of another may rest upon a reasonable expectation of pecuniary benefits or advantages from the continued life of the insured; on the contrary, many authorities affirm the correctness of that doctrine. In the case of Taylor v. Travellers' Ins. Co. 15 Tex.Civ.App. 254, 39 S.W. 185, 186, the court said: "Whenever there is such a relationship that the insurer [beneficiary] has a legal claim on the insured for services or support, or when, from the personal relation between them, the former has a reasonable right to expect some pecuniary advantage from the continuance of the life of the other, or to fear loss from his death, an insurable interest exists." In Wilton v. New York Life Ins. Co., 34 Tex.Civ.App. 156, 78 S.W. 403, 404, the rule was again announced in this language: "Such interest [that is, insurable interest], however, may exist in one not so related by blood or affinity to the insured when the facts show that he has a reasonable expectation of pecuniary benefit or advantage from the continued life of the insured." And in American Nat. Ins. Co. v. Wallace, Tex. Civ.App., 210 S.W. 859, 860, the doctrine was set forth as follows: "If Gussie Lowe and Willie Moore were grandnieces of Lizzie Barkin, their relationship was too remote to show that they had any insurable interest in her life, in the absence of testimony tending to show that they had reasonable ground to expect that if she had remained alive she would have contributed substantially to their welfare, financial or otherwise." The same doctrine was announced by the United States Supreme Court in Connecticut Mutual Life Ins. Co. v. Schaefer, 94 U.S. 457, 461, 24 L.Ed. 251, 253, 254, as follows: "All, therefore, which it seems necessary to show, in order to take the case out of the objection of being a wager policy, is, that the insured has some interest in the cestui que 'vie; that his temporal affairs, his just hopes and well-grounded expectations of support, of patronage, and advantage in life, will be impaired; so that the real purpose is not a wager, but to secure such advantages, supposed to depend on the life of another; such, we suppose, would be sufficient to prevent it from being regarded as a mere wager." Textwriters announce the same doctrine. Volume 1, Couch on Insurance Law, p. 764, says: "In brief, any reasonable expectation of pecuniary benefit or advantage from the continued life of another creates an insurable interest in such life." And Cooley's Briefs on Insurance, Vol. 1, p. 374, discussing this phase of an insurable interest, says: "As to what must be the nature of the pecuniary interest necessary to support the policy, the principles laid down in Appeal of Corson, 113 Pa. 438, 6 A. 213, 57 Am.Rep. 479, may fairly be regarded as sustained by the weight of authority. The court said that an insurable interest is not necessarily a definite pecuniary interest, such as is recognized and protected by law. It may be contingent, restricted as to time, or indeterminate in amount; but it must be actual, such as will reasonably justify a well-grounded expectation of advantage, dependent on the life insured, so that the purpose of the person effecting the insurance may be to secure that advantage, and not merely to put a wager on human life."

The material facts bearing upon the issue are these: Harry, Jr., was born in the home where Miss Drane resided; from the date of his birth until the insured lost her life she manifested a sincere devotion for and interest in the boy. He seemed to have aroused in her the mothering instinct, manifested until her death, which she met in an automobile wreck while en route from her home in Corsicana to College Station, carrying gifts to

Harry, who had just entered A. & M. College, as a freshman.

Mrs. John A. Pierce, a lifelong acquaintance and friend, testified that she knew Miss Drane was vitally interested in Harry from his birth; expressed her interest in and love for him, and her hope that he would get a good education; testified that Harry's parents were living in Miss Drane's home when he was born; while a young boy, his mother became an invalid; had to go to different climates; was gone off and on for five years. During this period, Harry lived in the home with Miss Drane, who cared for the boy just as a mother would have done; took him to school every day and brought him back.

Mrs. Rollin Shaw Guest testified that she had known Miss Dorothy Drane for about 29 years; was associated with her in different clubs; testified to Miss Drane's interest in Harry; went to school for him every day; told witness that she loved Harry better than anything in the world, and was happy to buy him clothing and other things that gave him pleasure; testified that Miss Drane manifested this feeling toward the boy from the time of his birth; had brought him to the home of witness when a tiny baby, playing with and amusing him.

Dr. Kelton, Corsicana physician, testified that he attended Harry's mother when he was born; that Miss Drane was present in the house on the occasion; that he had frequently seen Miss Drane and Harry together during the remainder of her life; that she kept Harry at the Drane home when his mother was sick, and away.

Mrs. Priscilla Baum testified to the care and treatment bestowed by Miss Drane upon Harry while his mother was sick and away from home, and, likewise, to different things she supplied him.

Mrs. Eugene Ezell, mother of Harry, testified that he was born in the house occupied by his parents and Miss Drane; that some time after his birth, she and her husband removed to a cottage, that Miss Drane made her home with them; later, Miss Drane's father and mother moved to the country, but, not desiring to live at the country place, Miss Drane moved her clothing, piano, rugs and other personal belongings to the home of witness and her husband and lived with them while they resided in the cottage, and that, after witness and her husband built their own home, Miss Drane seemed to consider it her home as much as she did the Drane home in the country, and preferred staying with them; testified that when Harry was christened, Dorothy was named as godmother. Witness also testified to an injury Harry sustained to one of his eyes, about June 1, 1930. He lost the sight of one of his eyes as the result of the accident; was treated by Dr. McReynolds, of Dallas; was brought from Corsicana to Dallas for treatment by Miss Drane, in her car, daily at first, then every other day, then twice a week, then once a week, and then once a month, over a period of about two years, Miss Drane accompanying Harry on every trip. Witness also testified that, because of illness, she left her home at Corsicana in September, 1930, went to San Angelo, was there five months, returning to Corsicana in April, 1932; then went back to San Angelo and stayed until July, 1932; from there, went to Los Angeles and remained until November, 1932; thereafter went to El Paso and stayed at a sanatorium fifteen months; went from there to Los Angeles and was there four months, returning home in November, 1934. During each of these absences, Harry was with Miss Drane. Witness thought she was the only logical person in the world to take care of him, as she had been in the home with him since his birth; had never been out of his life, except infrequently when he was away on visits. He called Miss Drane "Aunt Dorothy". Witness testified to the expenditures made by Miss Drane on behalf of Harry, as well as her continuous personal care of him.

Mrs. Getty Marschall, employed for more than fifteen years as a clerk in the boys' department of E. M. Kahn & Company, Dallas, testified that it was there, soon after she began work, she met Dorothy Drane, who became one of witness' first customers; at the time Harry was wearing wash suits, she began to fit him in clothes, and always fitted him; Miss Drane brought him along to the store most of the time; sometimes she would come in with friends and take things out; brought him into the store with her when a very small boy. Witness knew Miss Drane was deeply interested in Harry; manifested it as most mothers would manifest an interest in their own sons; was concerned in regard to his appearance; wanted him to look as well, if not better than, other children; witness thought Miss Drane was

his aunt because of the interest she manifested. Witness waited upon Miss Drane until Harry became too old for her department, then took him downstairs to one of the men to help fit him in men's clothes, and thereafter went with Miss Drane to that department; sold Miss Drane clothing for Harry every spring and fall, and she never objected to the price paid.

Ben Thomas, a former clerk in the Neiman-Marcus Store in Dallas, testified that he sold goods to Miss Drane for Harry, beginning in January, 1937; formerly, she had been a customer of another clerk in the store. She bought for Harry, sometimes bringing him with her and sometimes buying without his being present. The last transaction witness had with her was on September 14, 1937, a few days before her death, when she called over the 'phone from Corsicana and ordered a Tuxedo for Harry; witness sent, by special delivery, two Tuxedos—one of the finest quality, the other, less expensive. She kept the finest and most expensive and returned the other. Witness listed numerous articles that Miss Drane purchased for Harry in 1937, running into several hundred dollars.

Hugh Bryant, a pharmacist in Corsicana, testified that Miss Drane was attached to Harry and looked after his welfare. At the Bryant store in Corsicana, she gave Harry the benefit of her account and never questioned anything he purchased. He would come into the store, get things, and have them charged to her account, and at times paid his bills with checks signed by Miss Drane. This account was kept in this manner until her death. Miss Drane talked with witness about plans and provisions she desired to make for Harry. In the late summer before he entered A. & M. College, told witness that she had made plans for Harry's education; she wanted him to have the benefit of A. & M. College and then study medicine, stating that it would require something like ten or eleven years to finish, and she was making preparations to see that he got through college.

Mark H. DeWitt, district manager of the Jefferson Standard Life Insurance Company at Corsicana, testified that, prior to the trial, he had resided in Corsicana seventeen years; was well-acquainted with the Drane family, associated with them in church work in the Third Avenue Presbyterian Church, in which they were prominent; their relations were close and intimate. Witness knew Miss Drane quite well, as witness was active in Sunday school work and she was secretary and treasurer of the Church. Witness' attention was first attracted to the fact that Miss Drane always brought Harry, Jr., with her to Sunday school and frequently took him to church with her: saw them together all the time from this time on until her death; frequently visited in the Drane home and got the habit of seeing Harry there, and looked for him there; testified that Miss Drane took him on trips and gave him the advantages of travel. About a year before dying, she took the boy and a young friend of his on quite an extended trip out on the West Coast; took him to the Rose Bowl in California, on the occasion of the ball game between the California team and Southern Methodist University; took him to Canada and the Northwest. Miss Drane called witness about the first of December, 1927, and talked with him about an educational insurance proposition for Harry, who was then about seven years old. She called him "Little Harry"; went into the proposition of providing Harry with funds to insure his education in case of her death. She took out a policy for $5,510, which she thought was sufficient to provide $100 per month income for four years, but in December, 1936, called witness to her home, after he had been discussing with her the matter of changing the policy from its then existing form to an indemnity policy, told witness that she was ready to do something about her insurance; that provisions had already been made for Harry's education, and she wanted to keep the insurance and make it begin paying him a certain sum of money when he had finished his college education; stated that she wanted him to have $100 per month for at least ten years after he finished his interneship and began the practice of medicine, and that she wanted to convert the policy she then had into an indemnity policy that would mature in ten years from that date, or when Harry was supposed to get through, which was in 1947, or about that date; said she wanted the boy to have a break when he got through school, and enough money to pay his rent and telephone bill until he obtained a practice that would make him a living, or until he could make a living. Witness told Miss Drane that the $5,510 original policy would not provide that much money for that length of time, and she then said: "Well, write me another $5,000 of insurance; that will do it, won't it?"; wit-

ness answered that it would, and this accounts for the issuance of the policy for $5,000.

On Saturday before her death on the Monday following (Harry, Jr., having just entered A. & M. College as a freshman), Miss Drane wrote him (omitting immaterial parts) as follows: "Saturday afternoon. My dear Harry—True to my promise I am going to have a letter for you on Sunday and I'll try to have one for you on every Sunday and I expect sometimes in between—certainly until you get used to your new surroundings. I don't want you to feel burdened about answering my letters because you will have plenty to do without having that hanging over you, but after you write your mother and your daddy, if you have any time left, your Auntie will be grateful for one of those postcards she put in your trunk. You just make yourself comfortable about it and it will be O.K. by me just as everything else we understand each other about. * * * Have an angel food cake in the oven for tomorrow and what is left of it I'll bring down Monday along with the pie. You will have to hide it tho' to keep the other boys from taking it away from you. * * * Sure hope you get an early place in line and don't have to wait all day for your physical exam. I am not going to rave on in every letter about home (how) I miss you because you know that anyway, but I do want you to always remember that your Auntie loves you more than anyone in the world, and that you can always come to me for anything and about everything and know that I won't let you down. If I have always your love and respect and confidence, that is all I ask as recompense for the things I have always done for you and the pleasures I've helped make possible, if any—. Now I must go look after my cake but send you all my love, and will see you Monday. Devotedly, Auntie."

■ We doubt if a case could be made, though rehearsed for the purpose, revealing a deeper, more sincere and constant devotion of a woman for a child not her own, or more thoughtful ministries than were bestowed upon Harry by Miss Drane. Her affection for him was not simply the passing fondness such as the innocence and guilelessness of his infancy would arouse, but was persistent; her benefactions were not sporadic or occasional, but came constantly and increasingly as Harry approached manhood. Her love for the boy

seems to have been the ruling passion of her life, revealed in many ways, but notably in the statement to her neighbor, Mrs. Guest, also in the letter to Harry, written two days before her accidental death, that she loved him more than anything in the world, assuring him in that letter that, "You can always come to me for anything and about everything and know that I won't let you down."

We think the conclusion inescapable that Harry, Jr., had an insurable interest in the life of his devoted friend, Miss Dorothy A. Drane, at the time of the issuance of the policies and continuously to the time of her death, in that he had a reasonable expectation of pecuniary benefits and advantages from the continuation of her life.

■ Appellant contends however that, admitting Harry Eugene Ezell, Jr., had a reasonable expectation of pecuniary benefits from the continued life of the insured, the naming of Harry Eugene Ezell, Sr., as alternative beneficiary (who admittedly had no insurable interest in the life of the insured) vitiated the rider in toto, in that the valid provision in favor of Harry Eugene Ezell, Jr., cannot be segregated from the invalid provision in favor of Harry Eugene Ezell, Sr., therefore, the court erred in rendering judgment in favor of Harry, Jr. The argument in support of the above propositions is that, "The beneficiary clauses purporting to grant Harry Eugene Ezell, Sr., certain rights in the policies are inseparably bound up with the entire beneficiary clauses contained in the riders attached to the policies of insurance, and the entire clauses contained in said riders must fall." Appellant cites no authority in support of the proposition just stated and, in our opinion, none will be found.

Appellant also contends that the court erred in admitting in evidence, over his objection, the letter from Dorothy A. Drane to Harry Eugene Ezell, Jr., written on the Saturday prior to her death on Monday, the contention being that its admission was violative of Article 3716, R.C.S., in that the letter evidenced a transaction between Harry Eugene Ezell, Jr., and the deceased (appellant's testatrix), and constituted statements by the deceased to appellee, Harry, Jr.

■■ We do not think the court erred in the respect under consideration. The letter was proven to be in the handwriting

of Miss Drane on the testimony of Mrs. Ezell, mother of Harry. She was not a party to the suit; her husband, Dr. Ezell, was not a party to the suit, except in a representative capacity, and had expressly disclaimed any interest in the proceeds of the policies, except as guardian of the estate of his son, Harry, Jr. Under these circumstances, Mrs. Ezell not being either a necessary or proper party to the suit, the court did not err in permitting her to testify as to the handwriting of the deceased, or in admitting the letter in evidence. See Mitchell v. Deane, Tex.Com.App., 10 S.W. 2d 717, by the Supreme Court. However, even if improperly admitted, the contents of the letter were simply cumulative, accentuating and emphasizing the facts abundantly established by the testimony of other witnesses. The trial being without a jury, no harm, in our opinion, could have resulted to appellant by reason of the admission of the letter in evidence, even if improperly admitted.

■ Even if it could be said that appellant is entitled to the proceeds of the policies as independent executor of the estate of Dorothy A. Drane, deceased, we do not think he would be entitled to recover 12% damages and a reasonable attorney's fee, provided by the statute (Art. 4736). As heretofore stated, the Company did not deny liability, but timely filed an interpleader, expressing grave doubt as to who was entitled to the proceeds of the policies and as to the manner the same should be paid; disclaiming any interest in the fund, sought the advice of court, and prayed for the allowance of a reasonable interpleader's (attorney's) fee.

In the decree, the following finding, pertinent to the question under consideration, was made: "The court finds that the defendant Jefferson Standard Life Insurance Company, has never contested or denied its liability under said above described policies of life insurance, which matured on Sept. 20, 1937, for the respective sums of $11,020.00 and $10,000.00 by reason of the death of Dorothy A. Drane on that date which resulted from bodily injuries effected directly and independently of all other causes through external, violent and accidental means, or a total of $21,020.00, but that it has expressly admitted its liability and merely sought to ascertain who, as between the plaintiff and the other defendants herein, is entitled to receive the proceeds of said policies. (Tr. p. 34)" The court awarded

the Company $500, as a reasonable attorney's fee for services in the trial court, and an additional $250 for services rendered in the Appellate Court, same to be deducted from the proceeds of the policies.

The findings set out in the decree, in our opinion, are amply sustained by evidence and are adopted, as our conclusions on the issue under consideration. There being rival claimants of the fund, and the Company's interpleader having been seasonably filed, the failure of the Company to pay the proceeds of the policies to appellant on his demand not being willful, we do not think the Company should be penalized. See Nixon v. Malone, 100 Tex. 250, 98 S.W. 380, 99 S.W. 403; Southwestern Ins. Co. v. Woods Nat. Bank, Tex.Civ.App., 107 S. W. 114; Hall v. San Jacinto State Bank, Tex.Civ.App., 255 S.W. 506; Finn v. Metropolitan Life Ins. Co., Tex.Civ.App., 16 S.W.2d 922.

Appellee, Harry Eugene Ezell, Sr., as guardian of the estate of his son Harry, Jr., cross-assigns error (apparent of record), contending that the trial court erred in denying appellee payment of the double indemnity in a lump sum. This proposition involves the construction of the provisions of the insurance contract found in the riders heretofore set out. While the double indemnity rider obligated the Insurance Company to pay, in the event of the accidental death of the insured, double the amount mentioned in the face of the policies, yet we find no warrant for the contention that the amount, accruing under the double indemnity provisions, is separable from the face amount of the policies, or should be paid in a lump sum; on the contrary, think it obvious that the amount, thus accruing, blends with the face amount and is payable on the dates and in the installments, as provided, the difference being that the installments are doubled by reason of the double indemnity provisions.

The riders designating Harry Eugene Ezell, Jr., as beneficiary provide that, "These installments shall be paid to Harry Eugene Ezell, Jr., friend of the insured, if living on the due dates; otherwise to Harry Eugene Ezell, Sr., friend of the insured, if living on the due dates. Any portion of the proceeds remaining with the Company without provision as to final disposition shall be payable to the executors, administrators or assigns of the last beneficiary who received benefits thereunder." Several important questions are suggested: Was Har-

ry, Jr., vested with full title to the entire fund, on the death of the insured, or did he simply take the amounts as and when collected on the due dates? If the entire fund did not vest immediately in Harry, Jr. (Dr. Ezell having disclaimed), who would be entitled to collect the fund in case of his death prior to January 7, 1947, the due date of the first installment, or in case of his death afterwards but before the fund was all paid under the plan provided, leaving proceeds remaining with the Company? These questions are not before us for adjudication and, as Harry is still alive, could not have arisen. It follows, we think (although we make no adjudication in regard to the matter), that the attempt of the court to determine who should take on the death of Harry Eugene Ezell, Jr., was premature, in that such a question had not arisen; hence, being without jurisdiction, the court's adjudication to the effect that Hugh A. Drane, independent executor, should take on the death of Harry, Jr., was coram non judice, and void.

After an exhaustive consideration of the case, we think the judgment of the court below should be affirmed, therefore overrule all assignments of error, and appellees' cross-assignment, and affirm the judgment.

**Affirmed.**